3RD JUDICIAL DISTRICT COURT
DONA ANA COUNTY NM
FILED IN MY OFFICE
3/6/2018 4:30 PM
DAVID S. BORUNDA
Josephina Gomez

**STATE OF NEW MEXICO**
**COUNTY OF DONA ANA**
**THIRD JUDICIAL DISTRICT**

MARCIE SALOPEK, Trustee for
THE SALOPEK FAMILY HERITAGE
TRUST,

      Plaintiff,

v.

ZURICH AMERICAN LIFE INSURANCE
COMPANY, a foreign corporation.

      Defendant.

NO. D-307-CV-2018-00523

Arrieta, Manuel I.

## COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH, UNFAIR INSURANCE PRACTICES, UNFAIR TRADE PRACTICES AND NEGLIGENCE

Plaintiff, Marcie Salopek, on behalf of the Salopek Family Trust, through counsel, McGinn, Montoya, Love and Carpenter, P.A., and Peter Selvin, hereby sue ZURICH AMERICAN LIFE INSURANCE COMPANY, an Illinois corporation, and allege and state as follows:

### JURISDICTION AND VENUE

1.    Marcie Salopek, the Trustee of the Salopek Family Heritage Trust, is a resident and domiciliary of Las Cruces, Dona Ana County, New Mexico, and the matriarch of the pecan farming Salopek family.

2.    The Salopek Family Heritage Trust was created in 2015 in Las Cruces, New Mexico, to provide for the continuation of the Salopek family farming interests and to provide for the Salopek family descendants.

3.    Zurich American Life Insurance Company, is an Illinois corporation, which was

- 0.0

**EXHIBIT A**

doing business in the state of New Mexico and was subject to New Mexico insurance regulations, statutes, and laws.

4.  This New Mexico State Court has jurisdiction over the parties and the subject matter.

5.  Venue is proper in the New Mexico State District Court.

6.  New Mexico state law, statutes, and regulations apply to the facts of this case.

## A LIFE INSURANCE COMPANY MUST DEAL IN GOOD FAITH WITH ITS INSURED

7.  Life insurance is a promise to take care of a person's family by paying the amount of benefits for which premiums were paid, when that person dies.

8.  Life insurance companies which sell life insurance to New Mexico families have an obligation to deal fairly and in good faith with their insureds.

9.  Good faith and fair dealing means the insurance company must give equal consideration to its own interest and the interests of the policyholder.

10.  Before accepting the risk of insuring a person's life, in the post-internet world the insurance company has multiple resources to investigate an applicant's background, habits, and health.

11.  The life insurance company's pre-approval investigative tools include:

   a.  A signed medical authorization which allows the company to obtain all of the applicant's medical records;

   b.  Access to the Medical Information Bureau, a database available to 430 member insurance companies, which is designed to provide information on omitted, inconsistent or misrepresented information in an application needed to underwrite life insurance, including health information and other insurance applications that have been rejected;

   c.  The ability to require the applicant to undergo a physical examination, medical evaluations and testing before accepting the risk; and

2

        d.  All resources available on the internet, including criminal records, social media and websites.

12.     If there are inconsistent answers in a life insurance application, before agreeing to accept the risk, take the applicant's money and provide insurance, the life insurance company has the ability and duty to follow up with the insured to clear up any questions or can use any of its investigative tools to learn the correct answer.

13.     Based on the medical records it gathers, the medical testing it requires and the investigation it conducts, an insurance company has a choice to:

        a.  Agree to accept the risk, accept the money paid in premiums by the insured, and protect the insured's family with life insurance on his death;

        b.  Label the insured as a high risk, charge a higher premium, agree to accept the risk and provide insurance to protect the insured's family; or

        c.  Reject the application and the risk.

14.     It is the insurance company's obligation to do a complete investigation to clear up any inconsistencies in the application before accepting money from the insured and promising to protect his family upon his death.

15.     Life insurance companies design their policies with a two year contestability period during which the company can try to get out of its obligations and rescind the policy by claiming a mistake, omission, or misrepresentation in the application was important or material enough that it tricked the company into accepting the risk of coverage.

16.     After being given the opportunity for a complete investigation and a signed medical release, an insurance company is not allowed to rescind based on information it could have found through an adequate investigation.

17.     A life insurance policy that has been in effect for more than the initial two year

3

contestability period has vested and cannot be challenged by the insurance company based on any claimed inconsistency or misrepresentation in the application.

18.     When a new client already has in place a vested life insurance policy which he is giving up in exchange for a commitment from a different insurance company to issue a new life insurance policy in the same amount, the insurance company has a heightened obligation to investigate during the underwriting phase before accepting the risk and writing the policy.

19.     An insurance company which chooses not to conduct an adequate investigation or medical review and testing for an insured that is known to be giving up a vested policy based on the new company's promise to provide insurance is not allowed to rescind the policy based on information it could have learned through an adequate investigation.

**The History of the Salopek Family Pecan Farm**

20.     Vida Salopek came to America from Yugoslavia in 1929 looking for a better life for his family.  After working for someone else herding sheep, Vida bought 200 acres of raw land in the Mesilla Valley in 1935.  After he was settled in New Mexico, his wife and three young children, including Tony Salopek, moved here to live and work with him.

21.     In 1945, Vida's son, Tony Salopek bought 300 acres near his father's land, where he raised row crops and planted the first pecan tree.

22.     Over the years, as the family acquired more farm land, it learned that growing cotton and alfalfa was not profitable.  In 1970, the family made the decision to plant all of its valley acreage in pecan trees.

23.     The Salopek farm grew to become one of the largest pecan farms in the Southwest, with 2,300 acres of Salopek land planted in pecan trees and another 1,500 acres of leased land planted in pecan trees.

4

24.     In order to protect the farm and continue it as a family enterprise, Tony Salopek placed the farm in a trust, with an unusual provision that only his male descendants could inherit and have a say in how the farm was run.

25.     By 2015 the Salopek farm was being run by Tony's three sons, Mark Salopek, James Salopek and Ben Salopek with the assistance of their sons.

26.     The problem was that the three Salopek brothers had daughters, some whom were involved in businesses related to the farm.

27.     Mark and Marcie Salopek had four children, two boys and two girls named Dustin, Adam (Chuy), Wendy and Heather.

28.     In 2015, in order to correct the unfairness to female descendants created by Tony Salopek's trust and to provide equally for their daughters from the family business, the Salopek brothers created the Salopek Family Heritage Trust.

29.     In order to provide equally for the female Salopek descendants, the three brothers, including Mark Salopek, purchased insurance policies to place in the trust to provide an inheritance to their daughters that would equal the value in the farm.

**Mark Salopek Gives Up a Vested Insurance Policy Based on Zurich's Promise to Issue a New Life Insurance Policy That Provided the Same Amount of Coverage for the Salopek Family Heritage Trust**

30.     Mark Salopek, 68, wanted to do what was best to provide for his family members and the continuation of the family pecan farm after his death.

31.     In 2015 he had two fully-vested life insurance policies with John Hancock Life Insurance Company which provided $15,000,000 of insurance coverage to his family upon his death.

32.     Mr. Salopek did not give up his fully vested $15,000,000 insurance policy until

5

Zurich promised to issue a new life insurance policy with $15,000,000 in life insurance coverage that would replace the vested policies.

33.    Had Zurich turned him down for life insurance, he would have kept his vested $15,000,000 insurance policies with John Hancock.

34.    Because he already had two fully vested life insurance policies with an aggregate death benefit of $15,000,000, Mr. Salopek had no reason to falsify an application for insurance.

35.    In each application for new life insurance, the 68-year old Mark Salopek informed the insurance companies, including Zurich, that he was looking to replace the same amount of insurance that had already vested and was incontestable.

36.    Using insurance agent Ahmad Hashemian, Mark Salopek first applied for new life insurance company through Minnesota Life on August 14, 2015.

37.    As he did on every application form, Mark Salopek informed Minnesota Life that his father had died of cirrhosis of the liver at age 64 and his mother died of pancreatic cancer at age 72.  He admitted drinking beer daily and past use of smokeless tobacco.  He submitted to a physical conducted by the company's designee on August 14, 2015 and provided a medical authorization to obtain all of his records.

38.    After conducting a physical examination and collecting Mr. Salopek's medical records, Minnesota Life rejected Mr. Salopek's application for new life insurance on November 3, 2015.  Minnesota Life said it would only reconsider providing insurance if Mr. Salopek obtained a complete physical including both a PSA test and, given his family history, a colonoscopy.

39.    Minnesota Life's rejection of Mr. Salopek and the reasons for the rejection were recorded and made accessible to other insurance companies in the Medical Information Bureau database ("MIBs").  This information was accessible to Zurich Life Insurance Company before it

6

accepted the risk of insuring Mr. Salopek.

40.    The day after this rejection, on November 4, 2015, insurance agent Hashemian, through his agent or employee, Luis Miguel Sisniega, filled out another life insurance application for Zurich Life Insurance Company.  His answers on this form were virtually identical to the application form he filled out for Minnesota Life Insurance Company.

41.    In the application form to Zurich, Mr. Salopek disclosed that he had applied for and been rejected for life insurance by Minnesota Life and another company, Ameritas.

42.    Mr. Salopek told Zurich in the life insurance application that the $15 million life insurance policy he was applying for would replace $15 million in life insurance from John Hancock that had already vested and were beyond the contestability period.

43.    Mr. Salopek told Zurich in the life insurance application that his father had died of cirrhosis of the liver at age 64 and his mother died of pancreatic cancer at age 72.

44.    Mr. Salopek told Zurich in the life insurance application that he was a daily drinker, having at least one to two beers a day, including just two days before the application was filled out.

45.    Mr. Salopek told Zurich in the life insurance application that he had smoked and quit as a young man, but still "now and then" used chewing tobacco.  This answer on page three of the application was inconsistent with a box checked "no" later in the application at 7b by agent Sisnieros to a question about use of tobacco other than cigarettes.

46.    Mr. Salopek signed a release for Zurich to obtain all of his medical and consumer information, a consent for bodily fluid testing, an authorization for health-related information, a New Mexico authorization to obtain and disclose information, and a release of his tax information.

47.    At the present time, the Trust lacks any information or belief concerning whether,

7

before accepting this risk, Zurich accessed the information concerning Mark Salopek that was available to it on MIBs or whether Zurich sought or examined Mark Salopek's medical and consumer records for which he had given a release. Had Zurich obtained Mr. Salopek's medical records before accepting this risk, it would have learned that, because farming required that he work in the New Mexico sun, he had a small patch of skin cancer removed during an in-office procedure in July, 2013. Those medical records would show Mr. Salopek admitted daily alcohol use and reported that, at the time of that skin cancer visit, he was drinking about six beers a day. The removed skin cancer did not recur.

48.    Zurich did not require Mr. Salopek to undergo a new physical examination or blood testing, but relied upon the physical examination of Mr. Salopek on August 14, 2015 for his rejected application with Minnesota Life. That testing showed no tobacco or alcohol in his system at the time of the examination.

49.    On December 28, 2016, after having had the opportunity to conduct a full, independent investigation, and after having access to the information about Mark Salopek available on the MIBs database, Zurich accepted the risk and issued a life insurance policy on Mark Salopek's life in the amount of $15,000,000, to be paid on his death to the Salopek Family Heritage Trust. Zurich charged Mr. Salopek an annual premium of $405,915.04 for the $15,000,000 policy.

50.    Only after Zurich promised to protect his family did Mr. Salopek cancel the vested $15,000,000 policies with John Hancock.

51.    In January, 2016, Mark Salopek began having stomach pain which became so severe that Marcie insisted he go to the hospital. He continued to work right up until his exploratory surgery on January 15, 2016. After that surgery, he was diagnosed with metastatic

colon cancer.

52.     After seeking medical treatment at MD Anderson Hospital in Texas, Mark Salopek died on August 21, 2016.

53.     Mr. Salopek did not know he had metastatic colon cancer or that he was ill at the time he applied for insurance with Zurich.

54.     After Mark Salopek's death, his family submitted a claim for the life insurance promised by Zurich Insurance Company.

55.     Without telling her that they were considering rescinding the insurance policy, Zurich interviewed Mark's widow, Marcie Salopek, on December 20, 2016.

56.     The Zurich interviewer read Marcie some misinformation in Mark's medical records and then, asked her for her experience with Mark over their 38 years of marriage.

57.     Nothing Marcie answered was inconsistent with the answers Mark gave as to his habits at the time of the application.

58.     Marcie said the medical records were incorrect as Mark did not use snuff, but had used chewing tobacco.   She indicated there were times when Mark quit chewing tobacco completely, including during the period before he became ill, which would include the time of the application.

59.     Marcie said that during the course of their marriage, Mark drank beer almost daily, sometimes four to five beers a day, sometimes 12 or more.  He had never been arrested for DWI or been to alcohol treatment.   She was not asked how much he was drinking at the time of the application.

60.     When asked about the removal of skin cancer, because of its insignificance, Marcie replied that she did not understand the insurance company would consider that a surgery.

61.     On January 13, 2017, Zurich turned down the family's request for payment of the

$15,000,000 in life insurance it had promised Mr. Salopek.

62.     In its January 13, 2017 letter purporting to rescind the policy, Zurich indicated only

the following three grounds for its claimed rescission of the policy, because it was within the two

year incontestability period:

> **a.**   The inconsistency between Mr. Salopek saying he used chewing
> tobacco and "dip now and then" and the "No" that was checked in 7b concerning
> other tobacco use.
>
> **b.**   Its claim that Mr. Salopek's indication that he drank one to two beers
> a day at the time of the application was inconsistent with representations of his
> previous alcohol use; and
>
> **c.**   Mr. Salopek's failure to disclose the removal of non-recurring skin
> cancer in July, 2013 which Zurich now contends should have been disclosed in
> response to the compound Question 4 asking about "Cancer, tumor, polyp or
> disorder of the skin or breast."

63.     The only inconsistencies that Zurich indicated would have caused the company to

decline the risk were Mark's representations regarding alcohol consumption and his use of

chewing tobacco.

64.     Zurich did not cite the skin cancer as a reason supporting its purported rescission.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

All previous paragraphs are incorporated in this Count.

65.     The policy of insurance between The Salopek Family Heritage Trust and Defendant

Zurich was a contract by which Mark Salopek agreed to pay and Zurich accepted a pre-paid annual

premium of $405,915.04 in exchange for Zurich's legally enforceable promise to pay $15,000,000

to the Salopek Heritage Family Trust upon the death of Mark Salopek.

66.     After its own investigation, or failure to investigate, Zurich accepted the risk of insuring Mark Salopek, a 68-year old man.

67.     Mark Salopek and the Heritage Family Trust kept their end of the bargain by paying the annual premium in one lump sum up front.

68.     After Mark Salopek died, Zurich breached the policy of insurance by failing to perform by not paying the money it promised to the Salopek Heritage Family Trust to take care of Mark Salopek's family.

69.     Zurich intentionally and wrongfully sought to avoid its obligations under the contract by purporting to rescind the contract despite the information provided by Mark Salopek about his family's medical history, including information about his drinking habits and his occasional use of chewing tobacco.

70.     As a result of the breach of contract, the Salopek Family Heritage Trust and Mark Salopek's descendants did not receive the $15,000,000 promised by Defendant Zurich.

71.     Plaintiff Marcie Salopek, on behalf of the Salopek Family Heritage Trust seeks payment of the $15,000,000 owed by Zurich, plus pre-judgment interest at the rate of 10% from the date these proceeds should have been paid.  In addition, Plaintiff is entitled to attorney fees and costs for enforcing the insurance contract pursuant to NMSA 1978, § 39-2-1 (1977).

## COUNT II
## BAD FAITH INSURANCE CONDUCT

All previous paragraphs are incorporated into this Count II.

72.     Marcie Salopek is the legal representative of the Salopek Family Heritage Trust, which is the beneficiary under the life insurance policy issued by Defendant Zurich to her husband, Mark Salopek.

73.     Plaintiff has performed in a timely manner all duties and obligations required of her

11

under the terms of the Zurich policy.

74.     Defendant Zurich had the duty to act in good faith and deal fairly with Plaintiff in relation to her claim for life insurance benefits on behalf of the Salopek Family Heritage Trust after the death of Mark Salopek.

75.     Defendant Zurich willfully, recklessly, and without regard for Plaintiff's rights breached its duty to act in good faith and deal fairly with Plaintiff by, among other things,:

> a.   Misrepresenting to Mark Salopek pertinent facts or policy provisions relating to the coverage at issue.

> b.   Not conducting a proper, independent investigation before accepting the risk of coverage, but waiting to do such an investigation until after Mr. Salopek's death;

> c.   Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiff's claim;

> d.   Placing the interests of Zurich above the interests of the Salopek family;

> e.   Upon information and belief, having in place a policy and practice of overly scrutinizing and denying life insurance claims where the insured dies within two years of obtaining coverage; and

> f.   Failing to promptly provide Plaintiff a legitimate reason or explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim.

76.     As a direct and proximate result of the bad faith of Defendant Zurich, the Salopek Family Heritage Trust was not promptly paid the $15,000,000 to take care of the family and preserve the Salopek Family Farm upon the death of Mark Salopek, resulting in emotional distress to the family during a time when they were dealing with their grief surrounding Mark Salopek's death.

77.     In addition to recovering the damages listed above, Plaintiff is entitled to recover

her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977), as well as punitive damages.

**COUNT III**
**VIOLATION OF UNFAIR INSURANCE PRACTICES ACT**

All previous paragraphs are incorporated in Count III.

78.     At the time Mark Salopek applied for life insurance with Defendant Zurich,  there was in effect in New Mexico a statute, NMSA 1978, § 59A-16-20 (1997), which specifically prohibited unfair insurance claims practices.

79.     Defendant Zurich negligently or willfully violated NMSA § 59A-16-20, and committed unfair insurance practices within the state of New Mexico in, among others, one or more of the following ways:

   a.   Misrepresenting to Mark Salopek and his beneficiaries pertinent facts or policy provision relating to the life insurance he thought he had secured to protect his family;

   b.   Failing to adopt and implement reasonable standards for the prompt and accurate  investigation of an insured's application before accepting the risk of providing life insurance, particularly where it knew he was giving up vested coverage and failing to conduct an adequate investigation after Mr. Salopek's death;

   c.   Failing to acknowledge and act reasonably promptly upon communications with respect to the life insurance claim;

   d.   Failing to affirm coverage of the life insurance claim within a reasonable time after proof of loss requirement were completed and submitted by the insured;

   e.   Not attempting in good faith to effectuate the prompt, fair and equitable settlement of this life insurance claim; and/or

   f.   Compelling the Salopek Family Heritage Trust to institute litigation to secure the benefits provided under the life insurance policy.

80.     As a direct and proximate result of Defendant Zurich's unfair insurance practices,

13

the Salopek Family Heritage Trust was not paid the $15,000,000 in life insurance meant to provide

for the Salopek beneficiaries and farm.

81.     In addition to recovering the damages listed above, Plaintiff is entitled to recover

her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977). and,

because the violations were willful, under NMSA 1978, § 59A-16-30 (1990).  Plaintiff is also

entitled to recover punitive damages for Zurich's willful misconduct.

**COUNT IV**

**VIOLATION OF UNFAIR TRADE PRACTICES ACT**

All previous paragraphs are incorporated into Count IV.

82.     At the time when Mark Salopek applied for insurance with Defendant Zurich and

at all times after, the Unfair Practices Act, NMSA 1978, §57-12-1 et. seq., was in effect and

prohibited unfair and deceptive trade practices.

83.     In the sale and servicing of this life insurance policy Defendant Zurich violated the

New Mexico Unfair Practices Act, in, among others, one or more of the following ways:

    a.      causing confusion or misunderstanding as to the approval of the life insurance and the circumstances under which it could be rescinded;

    b.      representing that the life insurance it was promising would be available for the Salopek Family Heritage Trust upon the death of Mark Salopek;

    c.      representing that its $15,000,000 in life insurance would be available in place of the vested $15,000,000 Mr. Salopek gave up to become insured with Zurich;

    d.      offering this insurance with the intent to challenge payment if Mr. Salopek died within two years of the policy going into effect;

    e.      failing to pay the death benefit provided for under the policy;

    f.      using ambiguity or failing to state a material fact about the circumstances under which it would seek to rescind the policy based on the application;

14

g.    taking advantage of the lack of knowledge and experience of Mr. Salopek in the insurance arena to a grossly unfair degree; and

h.    taking action which resulted in a gross disparity between the value received and the price paid.

84.    As a direct and proximate consequence of the willful, unfair, deceptive, or unconscionable trade practices of Defendant Zurich described above and to be further proven at trial, Plaintiff is entitled to the promised $15,000,000 in life insurance proceeds, interest, costs, and attorney's fees and treble damages under NMSA 1978, § 57-12-10(B) and (C).

## COUNT V

## NEGLIGENCE

All previous paragraphs are incorporated in Count V.

85.    Defendant Zurich knew that Mark Salopek had in place two vested life insurance policies with a competitor, John Hancock, which provided $15,000,000 in life insurance coverage to Mr. Salopek's descendants through the Salopek Family Heritage Trust.

86.    Defendant Zurich knew that Mark Salopek was giving up his vested life insurance only upon its promise to replace that coverage with $15,000,000 in life insurance through Zurich.

87.    Under the circumstances of this case, Zurich had a duty to Mr. Salopek and his beneficiary, the Salopek Family Heritage Trust, to conduct a thorough and complete underwriting investigation which addressed any internal inconsistencies in the application and any questions about Mr. Salopek's health or habits before agreeing to replace Mr. Salopek's $15,000,000 of vested life insurance coverage.

88.    Given its knowledge that its insured was giving up vested life insurance benefits, Defendant Zurich, through its agents or employees, was negligent and breached its duty to Mr. Salopek and the Salopek Family Heritage Trust in one or more of the following ways:

15

a.  Engaging in underwriting practices that violated its own or industry practices;

b.  Upon information and belief, choosing not to review the MIBs data concerning Mr. Salopek;

c.  Choosing not to have Mr. Salopek undergo an independent medical evaluation and blood testing performed by a Zurich;

d.  Choosing not to have Mr. Salopek obtain a current medical evaluation from his own primary care provider, including a PSA test and colonoscopy;

e.  Not reviewing all of Mr. Salopek's medical records; and/or

f.  Not conducting a thorough investigation using all resources at its disposal before agreeing to insure Mr. Salopek's life.

The negligence of Zurich combined with its acceptance of the risk of insuring Mr. Salopek's life, resulted in damages to the Salopek Family Heritage Trust in the amount of $15,000,000, plus interest.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Marcie Salopek, as Trustee of the Salopek Family Heritage Trust, requests that a judgment be entered in her favor against Defendants Zurich for compensatory damages in the amount of $15,000,000, punitive damages in an amount to be determined at the time of trial, costs, pre- and post-judgment interest, attorney fees, treble damages, and such other relief as the Court deems just and proper.

Dated: March 6, 2018

Respectfully submitted,



McGINN
MONTOYA
LOVE
& CURRY
CHANGING LAWS
SAVING LIVES

201 Broadway SE
Albuquerque, NM 87102

p/ 505-843-6161
f/ 505 242 8227
tf 800 259 9240

**_/s/Randi McGinn_**
Randi McGinn
201 Broadway SE
Albuquerque, NM  87102
p/ (505) 843-6161
f/ (505) 242-8227
randi@mcginnlaw.com

Peter Selvin
Troy Gould, PC
1801 Century Park East, 16th Floor
Los Angeles, CA    90067-2367
p/(310) 553-4441
f/(310) 201-4746
pselvin@troygould.com
*Attorneys for Plaintiff Marcie Salopek*

17

<table>
<tr><td colspan="2" align="center"><strong>SUMMONS ON COMPLAINT</strong></td></tr>
</table>

| | |
|---|---|
| *District Court:*<br>**THIRD JUDICIAL DISTRICT**<br>*Court Address:*<br>**201 W. Picacho**<br>**Las Cruces, NM  88005**<br><br>*Court Telephone:*<br>**575-523-8296** | *Case Number:*<br>**D-307-CV-2018-00523**<br><br>*Assigned Judge:*<br>**Hon. Manuel I. Arrieta** |
| *Plaintiff (s):*<br>MARCIE SALOPEK, Trustee for<br>THE SALOPEK FAMILY HERITAGE<br>TRUST,<br><br>v.<br><br>*Defendant(s):*<br>ZURICH AMERICAN LIFE INSURANCE<br>COMPANY, a foreign corporation. | *Defendant:*<br>**ZURICH AMERICAN LIFE**<br>**INSURANCE COMPANY**<br>**c/o Office of Superintendent of**<br>**Insurance**<br>**Attn: Service of Process**<br>**P.O. Box 1689**<br>**Santa Fe, NM  87504-1689** |

**TO THE ABOVE NAMED DEFENDANT(S)**: Take notice that

1.      A lawsuit has been filed against you.  A copy of the lawsuit is attached.  The Court issued this Summons.

2.      You must respond to this lawsuit in writing.  You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons.  (The date you are considered served with the Summons is determined by Rule 1-004 NMRA)  The Court's address is listed above.

3.      You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4.      If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5.      You are entitled to a jury trial in most types of lawsuits.  To ask for a jury trial, you must request one in writing and pay a jury fee.

6.      If you need an interpreter, you must ask for one in writing.

3/8/2018

7.     You may wish to consult a lawyer.  You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

8.     Along with this Summons and Complaint you are also being served with the Plaintiff's First Interrogatories and First Requests for Production to Defendant Zurich American Life Insurance Company.  You are required to serve answers and responses to these documents within 45 days of service of this Summons, and file a Certificate of Service attesting to service with the Court.


         Dated at Las Cruces, New Mexico on this the ____8th____ day of __March____, 2018.

CLERK OF THE THIRD JUDICIAL DISTRICT COURT

By: _____



2

Submitted By:



MCGINN
CARPENTER
MONTOYA
& LOVE

*/s/Randi McGinn*
Randi McGinn
Michael E. Sievers
201 Broadway Blvd. SE
Albuquerque, New Mexico 87102
p: (505) 843-6161
f: (505) 242-8227
e: mike@mcginnlaw.com
   randi@mcginnlaw.com

Peter Selvin
Troy Gould, PC
1801 Century Park East, 16th Floor
Los Angeles, CA    90067-2367
p/(310) 553-4441
f/(310) 201-4746
pselvin@troygould.com

*Attorneys for Plaintiff*

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO
RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS

## RETURN[1]

STATE OF _____     )
                            )ss
COUNTY OF _____  )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in _____ county on the _____ day of _____, _____, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]   to the defendant _____ (*used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint*)

[ ]   to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]   to _____, a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____, (*used when the defendant is not presently at place of abode*) and by mailing by first class mail to the defendant at _____ (*insert defendant's last known mailing address*) a copy of the summons and complaint.

[ ]   to _____, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at _____ (*insert defendant's business address*) and by mailing the summons and complaint by first class mail to the defendant at _____ (*insert defendant's last known mailing address*).

[ ]   to _____, an agent authorized to receive service of process for defendant _____.

[ ]   to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

4

[ ]     to _____ (*name of person*), _____,
(*title of person authorized to receive service.   Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____[2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

## USE NOTE

    1.      Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

    2.      If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

5

3RD JUDICIAL DISTRICT COURT
Case 2:18-cv-00339-JAP-CG   Document 1-1   Filed 04/11/18   Page 23 of 64 DOÑA ANA COUNTY NM
FILED IN MY OFFICE
3/9/2018 3:29 PM
DAVID S. BORUNDA
Joseph Martinez

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
THIRD JUDICIAL DISTRICT COURT

MARCI SALOPEK, Trustee for
THE SALOPEK FAMILY HERITAGE TRUST,
        Plaintiff,

                            D-307-CV-2018-00523
                            JUDGE: MANUEL I. ARRIETA

ZURICH AMERICAN LIFE INSURANCE
COMPANY,
        Defendant.

## ORDER REQUIRING SCHEDULING REPORTS, A DISCOVERY PLAN, EXPERT WITNESS DISCLOSURE, AND LIMITING STIPULATIONS TO ENLARGE TIME FOR RESPONSIVE PLEADINGS

IT IS SO ORDERED:

A.    Plaintiff shall serve a copy of this order on each defendant with the summons and complaint and file a certificate of such service. Parties other than plaintiffs who assert claims against others who have not been served with this order shall serve a copy of this order on those against whom they assert claims with the pleading asserting such claims and shall file a certificate of such service.

B.    Within sixty (60) calendar days after the initial pleading is filed, parties of record shall file a scheduling report with copies to opposing parties and the assigned judge. Parties shall confer and are encouraged to file a Joint Scheduling Report, LR3-Form 2.12 NMRA for Track A or LR3-Form 2.13 for Tracks B and C, or, if they cannot agree, file an individual Scheduling Report, LR3-Form 2.13 NMRA. *See* copies of forms attached hereto.

C.    Any party who enters an appearance in the case more than sixty (60) calendar days after the filing of the initial pleading shall file a scheduling report within ten (10) business days and deliver a copy to the assigned judge.

D.      If all parties are not of record within sixty (60) calendar days of the filing of the initial pleading, the *p*arty making claims against the absent parties *(Plaintiff for Defendants, Third-Party Plaintiffs for Third-Party Defendants, etc.)* shall, within five (5) business days after the sixtieth (60th) day, file and serve parties of record and deliver to the assigned judge, a written explanation following LR3-Form 2.14 NMRA, "Delay in Putting the Matter at Issue."

E.      Counsel or parties who do not have attorneys may not stipulate to an enlargement of time greater than fourteen (14) calendar days for the filing of a responsive pleading without a motion and order. The motion shall state with particularity the reason(s) an enlargement is in the best interests of the parties. A copy of the motion and stipulation shall be delivered to all parties as well as counsel. The enlargement requested shall be for a specified time.

F.      When all parties have been joined and the case is at issue, the parties shall immediately notify in writing the assigned judge and the alternative dispute resolution coordinator.

G.      If appropriate, the court will refer this matter to settlement facilitation under Part VI of the Local Rules of the Third Judicial District Court.

H.      Within seventy-five (75) calendar days from the date the initial pleading is filed, or fifteen (15) calendar days after the case is at issue if LR3-Form 2.14 NMRA has been filed, the parties shall either:

    (1)     stipulate to a discovery plan and file the stipulation with the court, or

    (2)     request a hearing to establish a discovery plan pursuant to Paragraph F of Rule 1-026 NMRA.

    (3)     In the absence of a stipulated discovery plan or a timely request from a party for a hearing to establish a discovery plan, the following plan shall go into effect:
            Within one hundred (100) calendar days after the initial pleading was filed or fifteen (15) calendar days after a party has entered the suit, whichever is the later date, each party shall provide to all other parties:

        a.      The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed issues raised by the

pleadings, identifying the subjects of the information;

b.    A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed issues raised by the pleadings;

c.    A computation of any category of damages claimed by the disclosing party, providing copies or making available for inspection and copying the documents or other evidentiary materials and medical records and opinions, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered;

d.    For inspection and copying, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment;

e.    If the medical condition of a party is at issue, such party shall give a medical release authorization to opposing parties. The parties shall confer regarding the nature and extent of the release and stipulate, if possible. If the parties cannot agree, each party shall file a memorandum with a proposed medical release authorization advocating that party's proposed form to the court. A copy of the memorandum and proposed form shall be delivered to the assigned judge. Rule 1-007.1 NIMRA shall apply.

I.    Pursuant to Rule 1-026(E) NMRA, parties shall reasonably supplement discovery required in Subparagraphs (3)(a) through (e) of Paragraph H of this Order.

J.    Intent to Call Expert Witness - Disclosure.        No later than sixty (60) calendar days after filing their respective pleading or responsive pleading, all parties shall exchange a "Notice of Intent to Call Expert Witness(es)". The parties shall list the names, addresses and phone numbers for all anticipated experts, including a brief summary of the subject matter of each witness' testimony. If an expert has not yet been identified by a party, the parties must list the specialized area(s) in which

an expert is anticipated to be retained and a brief summary of the areas or issues on which the expert is expected to testify. With respect to each expert listed, all parties are to observe their continuing duty to timely supplement discovery and shall further abide by the requirements of Section 8 of the attachment to the Rule 16(B) Scheduling Order.

_____
DISTRICT COURT JUDGE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

David S. Borunda
Clerk of the District Court

_____
Deputy - Joe M Martinez,

LR3-Form 2.12

Supreme Court Approved
August 6, 2004

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
THIRD JUDICIAL DISTRICT COURT

Plaintiff

vs.

NO.: D-307-CV
Judge:

Defendant

JOINT SCHEDULING REPORT STIPULATING TO TRACK A

Come now all the parties to this case, (by their counsel of record) and stipulate as

follows:

1   The court has subject matter and personal jurisdiction, and venue is proper.

2   This case is appropriate for assignment to Track A

3   The parties do not intend to amend the pleadings or file dispositive motions

4   All parties will be ready for trial *by_____ (no more than six (6) months from*

   *filing of complaint)*

5   Witness lists will be exchanged and filed forty-five (45) days before trial

6   Discovery limited to interrogatories, requests for production and admission and no more

   than two (2) depositions per party.

7   All parties and counsel will either (a) select a facilitator by agreement of the parties, or

   (b) request the court's ADR coordinator to select a facilitator and will engage in a

   settlement conference within ninety (90) days from the date of the filing of the complaint.

   The parties may move for enlargement of time for the settlement conference for good

   cause shown The parties shall share the facilitator's fee, if any, equally.

8. Exhibits: exchanged at least fifteen (15) days before trial.

   This (jury _____ 6_____ 12 nonjury _____ ) matter will take _____ hours to try.

9. Conflicting court hearings (or other conflicts which show good cause for not setting trial)

   for two (2) months following the date the matter is ready for trial:

   _____

   _____

10. Other: _____

SUBMITTED BY:

Name of party: _____

Attorney: _____

Address: _____

             _____

Telephone Number _____


Name of party: _____

Attorney: _____

Address: _____

             _____

Telephone Number _____


CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each
party or each party's attorney on the _____ day of _____ , 20_____

                    _____
                    Signature

LR3-Form 2.13. ( _____ 's) (joint) scheduling report.

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
THIRD JUDICIAL DISTRICT COURT

,  Plaintiff

vs.

NO.: D-307-CV

Judge:

,  Defendant

( _____'S) (JOINT) SCHEDULING REPORT

1 .  This case should be assigned to Track _____.
2 .  Jurisdiction and Venue: _____Stipulated; _____Disputed; _____
        Why: _____
3 .  _____Non Jury; _____6-person jury; _____12-person jury.
4 .  Significant legal issues, if any: _____
_____
5 .  Trial witnesses presently known (defendant's, plaintiff's, etc.): _____
        State expert type: _____
6 .  Settlement:
        _____ [I] [We] have sufficient information to evaluate the case.
        _____ [I] [We] have provided sufficient information for opposing parties to evaluate
the case.
        _____ [I][We] need the following information from_____to evaluate the
case: _____

        _____ [I] [We] need the following discovery to obtain information sufficient to
evaluate the case:
_____ Explain why such information
cannot be obtained informally without formal discovery:
_____
        _____ [I] [We] have scheduled a settlement conference on _____, 20_____
with_____ *(facilitator)* or have requested the court's ADR
coordinator to refer to facilitation.
                                                        Or
        _____ [I] [We] request that this not be referred to facilitation because:
_____
The possibility of settlement is _____ good, _____ fair, _____poor.

7. Discovery:
    [I] [We] estimate it will take _____ months to complete discovery. *(Attach discovery plan if stipulated, or request for setting a discovery conference if wanted.)* If any party requests a discovery conference, answer the following:

    The party submitting this scheduling report intends to do the following discovery:

    _____
    *(If this is a joint scheduling report, each party shall answer this question.)*
    [Plaintiff] [Defendant] intends to do the following discovery:

    _____

8. [I] [We] estimate that trial will take ____ court days to try-
9. Dates counsel will not be available for trial due to the following conflicting court settings *(beginning with the date immediately following the time you estimate discovery will be completed).* _____
10. Stipulations: _____
11. Other:

    _____


SUBMITTED BY:

Name of party:    _____
Attorney:    _____
Address:    _____
    _____
Telephone Number    _____


Name of party:    _____
Attorney:    _____
Address:    _____
    _____
Telephone Number    _____


## CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each party or each party's attorney on the ____ day of _____ , 20 _____

    _____
    Signature

3RD JUDICIAL DISTRICT COURT
DONA ANA COUNTY NM
FILED IN MY OFFICE
3/12/2018 5:16 PM
DAVID S. BORUNDA
Javier Cuevas

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT

MARCIE SALOPEK, Trustee for
THE SALOPEK FAMILY HERITAGE
TRUST,

     Plaintiff,                     No. D-307-CV-2018-00523

v.

ZURICH AMERICAN LIFE INSURANCE
COMPANY, a foreign corporation.

     Defendant.

## AFFIDAVIT OF PETER SELVIN
## (NON-ADMITTED LAWYER)

STATE OF CALIFORNIA     )
                           )ss.
COUNTY OF LOS ANGELES    )

I, Peter Selvin, the Affiant herein, having been duly sworn, states upon oath:

1. Affiant is admitted to practice law and is in good standing to practice law in the State of California.

2. Affiant has complied with Rule 24-106 NMRA.

3. Affiant has associated with Randi McGinn of the law firm McGinn, Carpenter, Montoya & Love, PA, counsel licensed to practice law in good standing in New Mexico.

- 0.0

Peter Selvin, being first duly sworn, states upon oath, that all of the representations in this Affidavit are true and correct as far as he knows or is informed, and that such Affidavit is true, accurate and complete to the best of his knowledge and belief.

Dated: ___3__/__11_____, 2018

_____
Peter Selvin

SUBSCRIBED AND SWORN TO before me this __12__ day of __MARCH____, 2018.

_____
NOTARY PUBLIC

My commission expires:

__11-2-21_____

NYCOLLE HARDING
Notary Public – California
Los Angeles County
Commission # 2220402
My Comm. Expires Nov 2, 2021

2

- 0.0

STATE OF NEW MEXICO
**OFFICE OF SUPERINTENDENT OF INSURANCE**
Mailing Address: P.O. Box 1689, Santa Fe, NM  87504-1689
Physical Address: 1120 Paseo de Peralta, Room 428, Santa Fe, NM  87501
Main Phone: (505) 827-4601; Main Fax (505) 827-4734; Toll Free: 1-855-4-ASK-OSI
www.osi.state.nm.us

| | | |
|---|---|---|
| **SUPERINTENDENT OF**<br>**INSURANCE**<br>John G. Franchini – (505) 827-4299 | | **Service of Process**<br>Room 432<br>(505) 827-4241 |

**DEPUTY SUPERINTENDENT**
Robert Doucette – (505) 827-4439

March 13, 2018

Zurich American Insurance Company
Patrick Carty
165 Broadway
One Liberty Plaza 21st Flr
New York, NY 10006

**RE:    MARCIE SALOPEK, TRUSTEE FOR THE SALOPEK FAMILY HERITAGE**
**TRUST V. ZURICH AMERICAN LIFE INSURANCE COMPANY, A FOREIGHN**
**CORPORATION**
**D-307-CV-2018-00523**

Dear Mr. President:

In accordance with the provisions of NMSA 1978, Sections 59A-5-31 & 59A-32, enclosed is a copy of a Summons, Complaint, Interrogatories, Requests for Production, Request for Admissions, Order on the above styled cause.   Service was accepted on your behalf on 3/13/2018.

Respectfully,

*John G. Franchini*

John G. Franchini, Superintendent

CERTIFIED MAIL   7012 3460 0000 1400 8156

<table>
<tr><td colspan="2" align="center"><strong>SUMMONS ON COMPLAINT</strong></td></tr>
</table>

| | |
|---|---|
| *District Court:*<br>**THIRD JUDICIAL DISTRICT**<br>*Court Address:*<br>**201 W. Picacho**<br>**Las Cruces, NM  88005**<br><br>*Court Telephone:*<br>**575-523-8296** | *Case Number:*<br>**D-307-CV-2018-00523**<br><br>*Assigned Judge:*<br>**Hon. Manuel I. Arrieta** |
| *Plaintiff (s):*<br>MARCIE SALOPEK, Trustee for<br>THE SALOPEK FAMILY HERITAGE<br>TRUST,<br><br>**v.**<br><br>*Defendant(s):*<br>ZURICH AMERICAN LIFE INSURANCE<br>COMPANY, a foreign corporation. | *Defendant:*<br>**ZURICH AMERICAN LIFE**<br>**INSURANCE COMPANY**<br>**c/o Office of Superintendent of**<br>**Insurance**<br>**Attn: Service of Process**<br>**P.O. Box 1689**<br>**Santa Fe, NM  87504-1689** |

**TO THE ABOVE NAMED DEFENDANT(S)**:  Take notice that

1.      A lawsuit has been filed against you.  A copy of the lawsuit is attached.  The Court issued this Summons.

2.      You must respond to this lawsuit in writing.  You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons.  (The date you are considered served with the Summons is determined by Rule 1-004 NMRA)  The Court's address is listed above.

3.      You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4.      If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5.      You are entitled to a jury trial in most types of lawsuits.  To ask for a jury trial, you must request one in writing and pay a jury fee.

6.      If you need an interpreter, you must ask for one in writing.

3/8/2018

7.      You may wish to consult a lawyer.  You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

8.      Along with this Summons and Complaint you are also being served with the Plaintiff's First Interrogatories and First Requests for Production to Defendant Zurich American Life Insurance Company.  You are required to serve answers and responses to these documents within 45 days of service of this Summons, and file a Certificate of Service attesting to service with the Court.


        Dated at Las Cruces, New Mexico on this the ____8th____ day of __March____, 2018.

CLERK OF THE THIRD JUDICIAL DISTRICT COURT

By: _____

2

Submitted By:



McGINN
CARPENTER
MONTOYA
& LOVE

*/s/Randi McGinn*
Randi McGinn
Michael E. Sievers
201 Broadway Blvd. SE
Albuquerque, New Mexico 87102
p: (505) 843-6161
f: (505) 242-8227
e: mike@mcginnlaw.com
   randi@mcginnlaw.com

Peter Selvin
Troy Gould, PC
1801 Century Park East, 16th Floor
Los Angeles, CA    90067-2367
p/(310) 553-4441
f/(310) 201-4746
pselvin@troygould.com

*Attorneys for Plaintiff*

3

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO
RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS

## RETURN[1]

STATE OF _____        )
                                 )ss
COUNTY OF _____)

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to
this lawsuit, and that I served this summons in _____ county on the _____ day of
_____, _____, by delivering a copy of this summons, with a copy of complaint
attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]    to the defendant _____ (*used when defendant accepts a copy of
summons and complaint or refuses to accept the summons and complaint*)

[ ]    to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when
service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by
mail or commercial courier service, by delivering a copy of this summons, with a copy of
complaint attached, in the following manner:

[ ]    to _____, a person over fifteen (15) years of age and residing at
the usual place of abode of defendant _____, (*used when the defendant is not
presently at place of abode*) and by mailing by first class mail to the defendant at
_____ (*insert defendant's last known mailing address*) a copy of the summons and
complaint.

[ ]    to _____, the person apparently in charge at the actual place of
business or employment of the defendant and by mailing by first class mail to the defendant at
_____ (*insert defendant's business address*) and by mailing the summons and
complaint by first class mail to the defendant at _____ (*insert defendant's last
known mailing address*).

[ ]    to _____, an agent authorized to receive service of process for
defendant _____.

[ ]    to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem]
of defendant _____ (*used when defendant is a minor or an incompetent
person*).

[ ]    to  _____ (*name of person*), _____,
(*title of person authorized to receive service.  Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____[2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

## USE NOTE

    1.     Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

    2.     If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

5

3RD JUDICIAL DISTRICT COURT
DONA ANA COUNTY NM
FILED IN MY OFFICE
3/6/2018 4:30 PM
DAVID S. BORUNDA
Josephina Gomez

**STATE OF NEW MEXICO**
**COUNTY OF DONA ANA**
**THIRD JUDICIAL DISTRICT**

MARCIE SALOPEK, Trustee for
THE SALOPEK FAMILY HERITAGE
TRUST,

      Plaintiff,

v.

ZURICH AMERICAN LIFE INSURANCE
COMPANY, a foreign corporation.

      Defendant.

NO. D-307-CV-2018-00523

Arrieta, Manuel I.

## COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH, UNFAIR INSURANCE PRACTICES, UNFAIR TRADE PRACTICES AND NEGLIGENCE

Plaintiff, Marcie Salopek, on behalf of the Salopek Family Trust, through counsel, McGinn, Montoya, Love and Carpenter, P.A., and Peter Selvin, hereby sue ZURICH AMERICAN LIFE INSURANCE COMPANY, an Illinois corporation, and allege and state as follows:

### JURISDICTION AND VENUE

1.    Marcie Salopek, the Trustee of the Salopek Family Heritage Trust, is a resident and domiciliary of Las Cruces, Dona Ana County, New Mexico, and the matriarch of the pecan farming Salopek family.

2.    The Salopek Family Heritage Trust was created in 2015 in Las Cruces, New Mexico, to provide for the continuation of the Salopek family farming interests and to provide for the Salopek family descendants.

3.    Zurich American Life Insurance Company, is an Illinois corporation, which was

- 0.0

doing business in the state of New Mexico and was subject to New Mexico insurance regulations, statutes, and laws.

4.      This New Mexico State Court has jurisdiction over the parties and the subject matter.

5.      Venue is proper in the New Mexico State District Court.

6.      New Mexico state law, statutes, and regulations apply to the facts of this case.

## A LIFE INSURANCE COMPANY MUST DEAL IN GOOD FAITH WITH ITS INSURED

7.      Life insurance is a promise to take care of a person's family by paying the amount of benefits for which premiums were paid, when that person dies.

8.      Life insurance companies which sell life insurance to New Mexico families have an obligation to deal fairly and in good faith with their insureds.

9.      Good faith and fair dealing means the insurance company must give equal consideration to its own interest and the interests of the policyholder.

10.     Before accepting the risk of insuring a person's life, in the post-internet world the insurance company has multiple resources to investigate an applicant's background, habits, and health.

11.     The life insurance company's pre-approval investigative tools include:

   a.   A signed medical authorization which allows the company to obtain all of the applicant's medical records;

   b.   Access to the Medical Information Bureau, a database available to 430 member insurance companies, which is designed to provide information on omitted, inconsistent or misrepresented information in an application needed to underwrite life insurance, including health information and other insurance applications that have been rejected;

   c.   The ability to require the applicant to undergo a physical examination, medical evaluations and testing before accepting the risk; and

2

      d.  All resources available on the internet, including criminal records, social media and websites.

12.     If there are inconsistent answers in a life insurance application, before agreeing to accept the risk, take the applicant's money and provide insurance, the life insurance company has the ability and duty to follow up with the insured to clear up any questions or can use any of its investigative tools to learn the correct answer.

13.     Based on the medical records it gathers, the medical testing it requires and the investigation it conducts, an insurance company has a choice to:

      a.  Agree to accept the risk, accept the money paid in premiums by the insured, and protect the insured's family with life insurance on his death;

      b.  Label the insured as a high risk, charge a higher premium, agree to accept the risk and provide insurance to protect the insured's family; or

      c.  Reject the application and the risk.

14.     It is the insurance company's obligation to do a complete investigation to clear up any inconsistencies in the application before accepting money from the insured and promising to protect his family upon his death.

15.     Life insurance companies design their policies with a two year contestability period during which the company can try to get out of its obligations and rescind the policy by claiming a mistake, omission, or misrepresentation in the application was important or material enough that it tricked the company into accepting the risk of coverage.

16.     After being given the opportunity for a complete investigation and a signed medical release, an insurance company is not allowed to rescind based on information it could have found through an adequate investigation.

17.     A life insurance policy that has been in effect for more than the initial two year

contestability period has vested and cannot be challenged by the insurance company based on any claimed inconsistency or misrepresentation in the application.

18.     When a new client already has in place a vested life insurance policy which he is giving up in exchange for a commitment from a different insurance company to issue a new life insurance policy in the same amount, the insurance company has a heightened obligation to investigate during the underwriting phase before accepting the risk and writing the policy.

19.     An insurance company which chooses not to conduct an adequate investigation or medical review and testing for an insured that is known to be giving up a vested policy based on the new company's promise to provide insurance is not allowed to rescind the policy based on information it could have learned through an adequate investigation.

### The History of the Salopek Family Pecan Farm

20.     Vida Salopek came to America from Yugoslavia in 1929 looking for a better life for his family.  After working for someone else herding sheep, Vida bought 200 acres of raw land in the Mesilla Valley in 1935.  After he was settled in New Mexico, his wife and three young children, including Tony Salopek, moved here to live and work with him.

21.     In 1945, Vida's son, Tony Salopek bought 300 acres near his father's land, where he raised row crops and planted the first pecan tree.

22.     Over the years, as the family acquired more farm land, it learned that growing cotton and alfalfa was not profitable.  In 1970, the family made the decision to plant all of its valley acreage in pecan trees.

23.     The Salopek farm grew to become one of the largest pecan farms in the Southwest, with 2,300 acres of Salopek land planted in pecan trees and another 1,500 acres of leased land planted in pecan trees.

4

24.     In order to protect the farm and continue it as a family enterprise, Tony Salopek placed the farm in a trust, with an unusual provision that only his male descendants could inherit and have a say in how the farm was run.

25.     By 2015 the Salopek farm was being run by Tony's three sons, Mark Salopek, James Salopek and Ben Salopek with the assistance of their sons.

26.     The problem was that the three Salopek brothers had daughters, some whom were involved in businesses related to the farm.

27.     Mark and Marcie Salopek had four children, two boys and two girls named Dustin, Adam (Chuy), Wendy and Heather.

28.     In 2015, in order to correct the unfairness to female descendants created by Tony Salopek's trust and to provide equally for their daughters from the family business, the Salopek brothers created the Salopek Family Heritage Trust.

29.     In order to provide equally for the female Salopek descendants, the three brothers, including Mark Salopek, purchased insurance policies to place in the trust to provide an inheritance to their daughters that would equal the value in the farm.

**Mark Salopek Gives Up a Vested Insurance Policy Based on Zurich's Promise to Issue a New Life Insurance Policy That Provided the Same Amount of Coverage for the Salopek Family Heritage Trust**

30.     Mark Salopek, 68, wanted to do what was best to provide for his family members and the continuation of the family pecan farm after his death.

31.     In 2015 he had two fully-vested life insurance policies with John Hancock Life Insurance Company which provided $15,000,000 of insurance coverage to his family upon his death.

32.     Mr. Salopek did not give up his fully vested $15,000,000 insurance policy until

5

Zurich promised to issue a new life insurance policy with $15,000,000 in life insurance coverage that would replace the vested policies.

33.     Had Zurich turned him down for life insurance, he would have kept his vested $15,000,000 insurance policies with John Hancock.

34.     Because he already had two fully vested life insurance policies with an aggregate death benefit of $15,000,000, Mr. Salopek had no reason to falsify an application for insurance.

35.     In each application for new life insurance, the 68-year old Mark Salopek informed the insurance companies, including Zurich, that he was looking to replace the same amount of insurance that had already vested and was incontestable.

36.     Using insurance agent Ahmad Hashemian, Mark Salopek first applied for new life insurance company through Minnesota Life on August 14, 2015.

37.     As he did on every application form, Mark Salopek informed Minnesota Life that his father had died of cirrhosis of the liver at age 64 and his mother died of pancreatic cancer at age 72. He admitted drinking beer daily and past use of smokeless tobacco. He submitted to a physical conducted by the company's designee on August 14, 2015 and provided a medical authorization to obtain all of his records.

38.     After conducting a physical examination and collecting Mr. Salopek's medical records, Minnesota Life rejected Mr. Salopek's application for new life insurance on November 3, 2015. Minnesota Life said it would only reconsider providing insurance if Mr. Salopek obtained a complete physical including both a PSA test and, given his family history, a colonoscopy.

39.     Minnesota Life's rejection of Mr. Salopek and the reasons for the rejection were recorded and made accessible to other insurance companies in the Medical Information Bureau database ("MIBs"). This information was accessible to Zurich Life Insurance Company before it

6

accepted the risk of insuring Mr. Salopek.

40.     The day after this rejection, on November 4, 2015, insurance agent Hashemian, through his agent or employee, Luis Miguel Sisniega, filled out another life insurance application for Zurich Life Insurance Company.  His answers on this form were virtually identical to the application form he filled out for Minnesota Life Insurance Company.

41.     In the application form to Zurich, Mr. Salopek disclosed that he had applied for and been rejected for life insurance by Minnesota Life and another company, Ameritas.

42.     Mr. Salopek told Zurich in the life insurance application that the $15 million life insurance policy he was applying for would replace $15 million in life insurance from John Hancock that had already vested and were beyond the contestability period.

43.     Mr. Salopek told Zurich in the life insurance application that his father had died of cirrhosis of the liver at age 64 and his mother died of pancreatic cancer at age 72.

44.     Mr. Salopek told Zurich in the life insurance application that he was a daily drinker, having at least one to two beers a day, including just two days before the application was filled out.

45.     Mr. Salopek told Zurich in the life insurance application that he had smoked and quit as a young man, but still "now and then" used chewing tobacco.  This answer on page three of the application was inconsistent with a box checked "no" later in the application at 7b by agent Sisnieros to a question about use of tobacco other than cigarettes.

46.     Mr. Salopek signed a release for Zurich to obtain all of his medical and consumer information, a consent for bodily fluid testing, an authorization for health-related information, a New Mexico authorization to obtain and disclose information, and a release of his tax information.

47.     At the present time, the Trust lacks any information or belief concerning whether,

7

before accepting this risk, Zurich accessed the information concerning Mark Salopek that was available to it on MIBs or whether Zurich sought or examined Mark Salopek's medical and consumer records for which he had given a release. Had Zurich obtained Mr. Salopek's medical records before accepting this risk, it would have learned that, because farming required that he work in the New Mexico sun, he had a small patch of skin cancer removed during an in-office procedure in July, 2013. Those medical records would show Mr. Salopek admitted daily alcohol use and reported that, at the time of that skin cancer visit, he was drinking about six beers a day. The removed skin cancer did not recur.

48.     Zurich did not require Mr. Salopek to undergo a new physical examination or blood testing, but relied upon the physical examination of Mr. Salopek on August 14, 2015 for his rejected application with Minnesota Life. That testing showed no tobacco or alcohol in his system at the time of the examination.

49.     On December 28, 2016, after having had the opportunity to conduct a full, independent investigation, and after having access to the information about Mark Salopek available on the MIBs database, Zurich accepted the risk and issued a life insurance policy on Mark Salopek's life in the amount of $15,000,000, to be paid on his death to the Salopek Family Heritage Trust. Zurich charged Mr. Salopek an annual premium of $405,915.04 for the $15,000,000 policy.

50.     Only after Zurich promised to protect his family did Mr. Salopek cancel the vested $15,000,000 policies with John Hancock.

51.     In January, 2016, Mark Salopek began having stomach pain which became so severe that Marcie insisted he go to the hospital. He continued to work right up until his exploratory surgery on January 15, 2016. After that surgery, he was diagnosed with metastatic

colon cancer.

52.     After seeking medical treatment at MD Anderson Hospital in Texas, Mark Salopek died on August 21, 2016.

53.     Mr. Salopek did not know he had metastatic colon cancer or that he was ill at the time he applied for insurance with Zurich.

54.     After Mark Salopek's death, his family submitted a claim for the life insurance promised by Zurich Insurance Company.

55.     Without telling her that they were considering rescinding the insurance policy, Zurich interviewed Mark's widow, Marcie Salopek, on December 20, 2016.

56.     The Zurich interviewer read Marcie some misinformation in Mark's medical records and then, asked her for her experience with Mark over their 38 years of marriage.

57.     Nothing Marcie answered was inconsistent with the answers Mark gave as to his habits at the time of the application.

58.     Marcie said the medical records were incorrect as Mark did not use snuff, but had used chewing tobacco.  She indicated there were times when Mark quit chewing tobacco completely, including during the period before he became ill, which would include the time of the application.

59.     Marcie said that during the course of their marriage, Mark drank beer almost daily, sometimes four to five beers a day, sometimes 12 or more.  He had never been arrested for DWI or been to alcohol treatment.  She was not asked how much he was drinking at the time of the application.

60.     When asked about the removal of skin cancer, because of its insignificance, Marcie replied that she did not understand the insurance company would consider that a surgery.

9

61.     On January 13, 2017, Zurich turned down the family's request for payment of the

$15,000,000 in life insurance it had promised Mr. Salopek.

62.     In its January 13, 2017 letter purporting to rescind the policy, Zurich indicated only

the following three grounds for its claimed rescission of the policy, because it was within the two

year incontestability period:

> **a.**   The inconsistency between Mr. Salopek saying he used chewing
> tobacco and "dip now and then" and the "No" that was checked in 7b concerning
> other tobacco use.
>
> **b.**   Its claim that Mr. Salopek's indication that he drank one to two beers
> a day at the time of the application was inconsistent with representations of his
> previous alcohol use; and
>
> **c.**   Mr. Salopek's failure to disclose the removal of non-recurring skin
> cancer in July, 2013 which Zurich now contends should have been disclosed in
> response to the compound Question 4 asking about "Cancer, tumor, polyp or
> disorder of the skin or breast."

63.     The only inconsistencies that Zurich indicated would have caused the company to

decline the risk were Mark's representations regarding alcohol consumption and his use of

chewing tobacco.

64.     Zurich did not cite the skin cancer as a reason supporting its purported rescission.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

All previous paragraphs are incorporated in this Count.

65.     The policy of insurance between The Salopek Family Heritage Trust and Defendant

Zurich was a contract by which Mark Salopek agreed to pay and Zurich accepted a pre-paid annual

premium of $405,915.04 in exchange for Zurich's legally enforceable promise to pay $15,000,000

to the Salopek Heritage Family Trust upon the death of Mark Salopek.

10

66.     After its own investigation, or failure to investigate, Zurich accepted the risk of insuring Mark Salopek, a 68-year old man.

67.     Mark Salopek and the Heritage Family Trust kept their end of the bargain by paying the annual premium in one lump sum up front.

68.     After Mark Salopek died, Zurich breached the policy of insurance by failing to perform by not paying the money it promised to the Salopek Heritage Family Trust to take care of Mark Salopek's family.

69.     Zurich intentionally and wrongfully sought to avoid its obligations under the contract by purporting to rescind the contract despite the information provided by Mark Salopek about his family's medical history, including information about his drinking habits and his occasional use of chewing tobacco.

70.     As a result of the breach of contract, the Salopek Family Heritage Trust and Mark Salopek's descendants did not receive the $15,000,000 promised by Defendant Zurich.

71.     Plaintiff Marcie Salopek, on behalf of the Salopek Family Heritage Trust seeks payment of the $15,000,000 owed by Zurich, plus pre-judgment interest at the rate of 10% from the date these proceeds should have been paid.  In addition, Plaintiff is entitled to attorney fees and costs for enforcing the insurance contract pursuant to NMSA 1978, § 39-2-1 (1977).

## COUNT II
## BAD FAITH INSURANCE CONDUCT

All previous paragraphs are incorporated into this Count II.

72.     Marcie Salopek is the legal representative of the Salopek Family Heritage Trust, which is the beneficiary under the life insurance policy issued by Defendant Zurich to her husband, Mark Salopek.

73.     Plaintiff has performed in a timely manner all duties and obligations required of her

11

under the terms of the Zurich policy.

74.     Defendant Zurich had the duty to act in good faith and deal fairly with Plaintiff in relation to her claim for life insurance benefits on behalf of the Salopek Family Heritage Trust after the death of Mark Salopek.

75.     Defendant Zurich willfully, recklessly, and without regard for Plaintiff's rights breached its duty to act in good faith and deal fairly with Plaintiff by, among other things,:

> a.   Misrepresenting to Mark Salopek pertinent facts or policy provisions relating to the coverage at issue.
>
> b.   Not conducting a proper, independent investigation before accepting the risk of coverage, but waiting to do such an investigation until after Mr. Salopek's death;
>
> c.   Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiff's claim;
>
> d.   Placing the interests of Zurich above the interests of the Salopek family;
>
> e.   Upon information and belief, having in place a policy and practice of overly scrutinizing and denying life insurance claims where the insured dies within two years of obtaining coverage; and
>
> f.   Failing to promptly provide Plaintiff a legitimate reason or explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim.

76.     As a direct and proximate result of the bad faith of Defendant Zurich, the Salopek Family Heritage Trust was not promptly paid the $15,000,000 to take care of the family and preserve the Salopek Family Farm upon the death of Mark Salopek, resulting in emotional distress to the family during a time when they were dealing with their grief surrounding Mark Salopek's death.

77.     In addition to recovering the damages listed above, Plaintiff is entitled to recover

her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977), as well as punitive damages.

<b>COUNT III</b><br><b>VIOLATION OF UNFAIR INSURANCE PRACTICES ACT</b>

All previous paragraphs are incorporated in Count III.

78.     At the time Mark Salopek applied for life insurance with Defendant Zurich,  there was in effect in New Mexico a statute, NMSA 1978, § 59A-16-20 (1997), which specifically prohibited unfair insurance claims practices.

79.     Defendant Zurich negligently or willfully violated NMSA § 59A-16-20, and committed unfair insurance practices within the state of New Mexico in, among others, one or more of the following ways:

a.      Misrepresenting to Mark Salopek and his beneficiaries pertinent facts or policy provision relating to the life insurance he thought he had secured to protect his family;

b.      Failing to adopt and implement reasonable standards for the prompt and accurate  investigation of an insured's application before accepting the risk of providing life insurance, particularly where it knew he was giving up vested coverage and failing to conduct an adequate investigation after Mr. Salopek's death;

c.      Failing to acknowledge and act reasonably promptly upon communications with respect to the life insurance claim;

d.      Failing to affirm coverage of the life insurance claim within a reasonable time after proof of loss requirement were completed and submitted by the insured;

e.      Not attempting in good faith to effectuate the prompt, fair and equitable settlement of this life insurance claim; and/or

f.      Compelling the Salopek Family Heritage Trust to institute litigation to secure the benefits provided under the life insurance policy.

80.     As a direct and proximate result of Defendant Zurich's unfair insurance practices,

the Salopek Family Heritage Trust was not paid the $15,000,000 in life insurance meant to provide

for the Salopek beneficiaries and farm.

81.      In addition to recovering the damages listed above, Plaintiff is entitled to recover

her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977). and,

because the violations were willful, under NMSA 1978, § 59A-16-30 (1990).   Plaintiff is also

entitled to recover punitive damages for Zurich's willful misconduct.

### COUNT IV

### VIOLATION OF UNFAIR TRADE PRACTICES ACT

All previous paragraphs are incorporated into Count IV.

82.      At the time when Mark Salopek applied for insurance with Defendant Zurich and

at all times after, the Unfair Practices Act, NMSA 1978, §57-12-1 et. seq., was in effect and

prohibited unfair and deceptive trade practices.

83.      In the sale and servicing of this life insurance policy Defendant Zurich violated the

New Mexico Unfair Practices Act, in, among others, one or more of the following ways:

a.      causing confusion or misunderstanding as to the approval of the life insurance and the circumstances under which it could be rescinded;

b.      representing that the life insurance it was promising would be available for the Salopek Family Heritage Trust upon the death of Mark Salopek;

c.      representing that its $15,000,000 in life insurance would be available in place of the vested $15,000,000 Mr. Salopek gave up to become insured with Zurich;

d.      offering this insurance with the intent to challenge payment if Mr. Salopek died within two years of the policy going into effect;

e.      failing to pay the death benefit provided for under the policy;

f.      using ambiguity or failing to state a material fact about the circumstances under which it would seek to rescind the policy based on the application;

g.    taking advantage of the lack of knowledge and experience of Mr. Salopek in the insurance arena to a grossly unfair degree; and

h.    taking action which resulted in a gross disparity between the value received and the price paid.

84.    As a direct and proximate consequence of the willful, unfair, deceptive, or unconscionable trade practices of Defendant Zurich described above and to be further proven at trial, Plaintiff is entitled to the promised $15,000,000 in life insurance proceeds, interest, costs, and attorney's fees and treble damages under NMSA 1978, § 57-12-10(B) and (C).

## COUNT V

## NEGLIGENCE

All previous paragraphs are incorporated in Count V.

85.    Defendant Zurich knew that Mark Salopek had in place two vested life insurance policies with a competitor, John Hancock, which provided $15,000,000 in life insurance coverage to Mr. Salopek's descendants through the Salopek Family Heritage Trust.

86.    Defendant Zurich knew that Mark Salopek was giving up his vested life insurance only upon its promise to replace that coverage with $15,000,000 in life insurance through Zurich.

87.    Under the circumstances of this case, Zurich had a duty to Mr. Salopek and his beneficiary, the Salopek Family Heritage Trust, to conduct a thorough and complete underwriting investigation which addressed any internal inconsistencies in the application and any questions about Mr. Salopek's health or habits before agreeing to replace Mr. Salopek's $15,000,000 of vested life insurance coverage.

88.    Given its knowledge that its insured was giving up vested life insurance benefits, Defendant Zurich, through its agents or employees, was negligent and breached its duty to Mr. Salopek and the Salopek Family Heritage Trust in one or more of the following ways:

       a.   Engaging in underwriting practices that violated its own or industry practices;

       b.   Upon information and belief, choosing not to review the MIBs data concerning Mr. Salopek;

       c.   Choosing not to have Mr. Salopek undergo an independent medical evaluation and blood testing performed by a Zurich;

       d.   Choosing not to have Mr. Salopek obtain a current medical evaluation from his own primary care provider, including a PSA test and colonoscopy;

       e.   Not reviewing all of Mr. Salopek's medical records; and/or

       f.   Not conducting a thorough investigation using all resources at its disposal before agreeing to insure Mr. Salopek's life.

The negligence of Zurich combined with its acceptance of the risk of insuring Mr. Salopek's life, resulted in damages to the Salopek Family Heritage Trust in the amount of $15,000,000, plus interest.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Marcie Salopek, as Trustee of the Salopek Family Heritage Trust, requests that a judgment be entered in her favor against Defendants Zurich for compensatory damages in the amount of $15,000,000, punitive damages in an amount to be determined at the time of trial, costs, pre- and post-judgment interest, attorney fees, treble damages, and such other relief as the Court deems just and proper.

Dated: March 6, 2018

Respectfully submitted,



**_/s/Randi McGinn_**
Randi McGinn
201 Broadway SE
Albuquerque, NM  87102
p/ (505) 843-6161
f/ (505) 242-8227
randi@mcginnlaw.com

Peter Selvin
Troy Gould, PC
1801 Century Park East, 16th Floor
Los Angeles, CA    90067-2367
p/(310) 553-4441
f/(310) 201-4746
pselvin@troygould.com
*Attorneys for Plaintiff Marcie Salopek*

17

**STATE OF NEW MEXICO**
**COUNTY OF DONA ANA**
**THIRD JUDICIAL DISTRICT**

MARCIE SALOPEK, Trustee for
THE SALOPEK FAMILY HERITAGE
TRUST,

        Plaintiff,

                              No. D-307-CV-2018-00523

v.

ZURICH AMERICAN LIFE INSURANCE
COMPANY, a foreign corporation.

        Defendant.

## PLAINTIFF'S FIRST INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO DEFENDANT ZURICH

TO:   Zurich American Life Insurance Company
       c/o Office of Superintendent of Insurance
       Attn: Service of Process
       P.O. Box 1689
       Santa Fe, NM  87504-1689

Plaintiff Marcie Salopek, on behalf of the Salopek Family Heritage Trust, through her

attorneys, McGINN, MONTOYA, LOVE & CURRY, P.A., and pursuant to Rules 1-033, 1-034,

and 1-036 NMRA, propounds the following Interrogatories, Requests for Production, and

Requests for Admission on Defendant Zurich American Life Insurance Company.   Verified

answers are to be produced within forty five (45) days of the date received.

### Instructions

    1.    "Zurich," "you," and "your" refers to Defendant Zurich American Life Insurance
Company and any of its supervisors, employees, agents, or attorneys with knowledge of the
requested information.

    2.    Before producing information, you must make a thorough, diligent search of all
your books, records, files and other documents in an effort to obtain and elicit all responsive
information and documents.

3.      For documents produced, please Bates-stamp all documents and identify which Bates numbered documents are being produced in response to each request for production.

4.      If a question or request cannot be provided in full, then answer or enclose documents to the extent possible and specify the reasons for your inability to fully answer or produce the information and the date upon which any delayed information will be provided.

5.      If a privilege not to answer is claimed, then provide a privilege log identifying each document or communication as to which a privilege is claimed, the nature of the privilege and the legal and factual basis for each such claim of privilege.  If you claim certain documents are confidential, please produce all non-confidential documents and provide counsel with a proposed protective order in compliance with New Mexico law.

6.      If a refusal to answer a question or a request for production of documents is stated on the grounds of burdensomeness or expense, identify the number, nature and location of documents needed to be searched, the location of the persons needed to be examined and the number of person hours and cost required to conduct the search or examination.

7.      If you are unsure how to answer questions or a request for production of documents because of vagueness or ambiguity, please have your attorney contact Plaintiff's counsel before the requests are due for clarification.

8.      These requests are of an ongoing nature, and should you or your agents, or attorneys acquire additional responsive information, these responses shall be updated to provide the additional information.

## Definitions

**Document** refers to all forms of communication including printed material, articles, books, computer information or electronic information stored in any form.   It includes, but is not limited to, all memos, e-mail, computer data, correspondence, reports, phone messages, calendar entries, videotapes, photographs, statistical information, spreadsheets, plans, diagrams, drawings, photographs, videotapes or other documents or information responsive to the questions below.

**Identify** means to provide the name of a person, contact person or company; their employer and position or job description; their home and work address and all phone numbers, including, but not limited to home, work and cell phone numbers and an e-mail address.

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**      Admit that, at all times that he was dealing with Mark Salopek, including when he filled out the application for insurance, Ahmad Hashemian was an agent of Zurich.

   **Admit/Deny:**

**Request for Admission No. 2:**       Admit that, at all times that he was dealing with Mark Salopek, including when he filled out the application for insurance, Luis Miguel Sisniega was an agent of Zurich.

    **Admit/Deny:**

**Request for Admission No. 3:**       Admit that Zurich knew that, at the time of his application with Zurich, Mark Salopek had vested life insurance policies with John Hancock totalling $15,000,000.

    **Admit/Deny:**

**Request for Admission No. 4:**       Admit that Zurich knew at the time of the application that Mark Salopek was looking to replace his vested life insurance with a $15,000,000 policy with Zurich.

    **Admit/Deny:**

**Request for Admission No. 5:**       Admit that, in his application for life insurance with Zurich, Mark Salopek informed Zurich that, at the time of his application, he drank alcohol on a daily basis.

    **Admit/Deny:**

**Request for Admission No. 6:**       Admit that Zurich had the ability to access information in the Medical Information Bureau at the time Mark Salopek applied for insurance.

    **Admit/Deny:**

**Request for Admission No. 7:**       Admit that Mark Salopek informed Zurich in his application that he had already been turned down for life insurance by two other companies.

    **Admit/Deny:**

### INTERROGATORIES

**Interrogatory No. 1:**        Please identify the person(s) who did the following:

A. All person(s) who discussed, interviewed or spoke to Mark Salopek on behalf of Zurich before his application for insurance was approved;

B. All person(s) who underwrote or investigated Mark Salopek's application, health history and background before his application for insurance was approved;

C. All person(s) involved in making the decision to approve Mr. Salopek's application and accept the risk for providing insurance on his life;

D. All person(s) involved in the investigation into Mr. Salopek after his death; and

E. All person(s) involved in the decision to rescind the life insurance policy for Mr. Salopek.

**Answer:**

**Interrogatory No. 2:**        Identify the person(s) most knowledgeable about Zurich's policies and procedures in 2015 and 2016 concerning:

A. Underwriting practices for life insurance;

B. Post death investigations for a life insurance policy within the two year contestability period;

C. Rescission of life insurance policies; and

D. Training of underwriters and post-claim investigators for life insurance policies.

**Answer:**

**Interrogatory No. 3:**        For each year from 2012 through 2017, inclusive, please provide the following information on an annual basis for Zurich:

A.        The number of life insurance policies paid and denied for each year;

4

B.      Of the life insurance policies denied, how many in each year were within the two year contestability period;

C.      Of all policies denied within the two year contestability period, the number of policies denied based on Zurich's claim there was a misrepresentation of some kind by the applicant; and

D.      For all life insurance policies denied within the two year contestability period based on a claimed misrepresentation, please identify for each denial, the following information:

      i.      the misrepresentation(s) claimed; and

      ii.      the question to which the misrepresentation was claimed to be made.

**Answer:**

**Interrogatory No. 4:**      From 2012 to the present, please provide the following information for every claim, lawsuit or complaint involving Zurich's denial of life insurance coverage:

A.  Identify the insured filing the claim, complaint or lawsuit, and their attorneys;

B.  Identify the place the claim, complaint or lawsuit was filed, including the jurisdiction and claim/case number;

C.  Describe the nature of the claim;  and

D.  Describe the final disposition of the claim or lawsuit.

**Answer:**

**Interrogatory No. 5:**      From 2010 to the present, please provide the following information for every investigation, claim or action by any state or government agency involving Zurich's denial of life insurance coverage:

    A.  Identify the state or federal agency conducting the investigation or filing the action, and the person(s) or attorney(s) in charge of the investigation;

    B.  Provide the dates of the investigation or claim;

    C.  Describe the nature of the investigation or claim by the government agency; and

    D.  Describe the final disposition of the investigation or claim.

**Answer:**

**Interrogatory No. 6:**     Explain, in detail, any denial or partial denial of any request for admission in Plaintiff's Requests for Admissions, which are listed above in this document, including for each denial, the identity of the witnesses and evidence which supports your denial.

    **Answer:**

**Interrogatory No. 7:**     If you contend that Zurich American Life Insurance Company is not the correct defendant in this action, please indicate the Zurich corporate entity which should be named in this lawsuit and explain why it should be named as the appropriate defendant.

    **Answer:**

**Interrogatory No. 8:**     For each affirmative defense asserted in your answer, please identify the name, address, and telephone number of each witness who will support the defense and identify all physical evidence which supports the affirmative defense.

    **Answer:**

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**     Produce a Bates-stamped copy of the entire life insurance policy provided by Zurich on Mark Salopek's life, including all attachments included with the policy provided to Mr. Salopek.

    **Response:**

**Request for Production No. 2:**     Produce a Bates-stamped copy of the entire underwriting file in the form it existed at the time Zurich accepted the risk of insuring Mr. Salopek on December 28, 2016.

    **Response:**

**Request for Production No. 3:**     Produce a Bates-stamped copy of the entire file on Mark Salopek's claim, including all notes of phone calls, medical records and statements obtained and any other entry from December 28, 2016 until the date Zurich rescinded the policy in January, 2017.

    **Response:**

**Request for Production No. 4:**     Produce for inspection and copying by counsel, the original signed application from Mark Salopek.

    **Response:**

**Request for Production No. 5:**     Produce all manuals, memos or other documents in effect in 2015 which provided the rules or guidelines for underwriting Zurich life insurance policies.

    **Response:**

**Request for Production No. 6:**     For 2012-2015, produce all training materials, slide presentations, self-study, videos or other training documents utilized with or presented to Zurich underwriters or persons whose job was deciding to accept the risk of life insurance.

    **Response:**


**Request for Production No. 7:**     Produce all manuals, memos or other documents in effect in 2016-2017 which provided the rules or guidelines for investigating and denying claims under Zurich life insurance policies.

    **Response:**


**Request for Production No. 8:**     For 2012-2017, all training materials, slide presentations, self-study, videos or other training documents utilized with or presented to those employees or agents whose job was to investigate post-death claims and/or make the decision to deny coverage.

    **Response:**


**Request for Production No. 9:**     From November 4, 2015 until the date of the rescission letter in January 2017, produce any correspondence, notes, memos, e-mails, or any other communications related to the denial of the Salopek life insurance claim.

    **Response:**


**Request for Production No. 10:**     From 2012 to the present, please produce every claim, lawsuit or complaint involving any Zurich denial of life insurance coverage.

    **Response:**


**Request for Production No. 11:**     From 2010 to the present, please produce every notice of pending investigation, lawsuit or complaint by any state or government agency involving any Zurich's underwriting, claims or other practices involving life insurance policies.

    **Response:**

**Request for Production No. 12:**     Produce all documents which support your denials of any of the Requests for Admission, indicating which documents apply to which denials.

    **Response:**


**Request for Production No. 13:**     Produce copies of all documents which support any affirmative defense, identifying for each which defense the document/evidence supports.

    **Response:**



**Dated:**  March 9, 2018                     Respectfully submitted,



McGINN
MONTOYA
LOVE
& CURRY
CHANGING LAWS
SAVING LIVES

**/s/ Randi McGinn**
Randi McGinn
201 Broadway Blvd., SE
Albuquerque, NM  87102
Phone:  (505) 843-6161
Fax:     (505) 242-8227
randi@mcginnlaw.com

Peter Selvin
Troy Gould, PC
1801 Century Park East, 16th Floor
Los Angeles, CA    90067-2367
p/(310) 553-4441
f/(310) 201-4746
pselvin@troygould.com

**Attorneys for Plaintiff**

9