# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARCIE SALOPEK, Trustee for**
**THE SALOPEK FAMILY HERITAGE TRUST**
        Plaintiff,

v.                                                    NO. 18-CV-00339 JAP/CG

**ZURICH AMERICAN LIFE INSURANCE**
**COMPANY**,
                Defendant

## MEMORANDUM OPINION AND ORDER

This case arises out of a dispute between Plaintiff Marcie Salopek, widow of Mark

Salopek (Mr. Salopek) and Trustee for The Salopek Family Heritage Trust (Plaintiff), and

Defendant Zurich American Life Insurance Company (Defendant). Plaintiff alleges that

Defendant improperly rescinded a life insurance policy it issued to Mr. Salopek. The Complaint

alleged five counts.[1] The Court dismissed three of those counts at the pleading stage for failure to

state a plausible claim.[2] The two remaining counts are: Count I, Breach of Contract and Count II,

Bad Faith Insurance Conduct.

Defendant alleges that because of Mr. Salopek's material misrepresentations about his

alcohol and tobacco use in his application for life insurance, Defendant properly rescinded the

policy within the statutory two-year contestability period. Plaintiff counters that Defendant knew

or had reason to know that Mr. Salopek's representations were inaccurate and therefore, when

Defendant rescinded the life insurance policy, Defendant breached the contract and did so in bad

---

[1] *See* COMPLAINT FOR BREACH OF CONTRACT, BAD FAITH, UNFAIR INSURANCE PRACTICES, UNFAIR TRADE PRACTICES AND NEGLIGENCE (Doc. 1-1) (Complaint).
[2] On December 11, 2019, the Court dismissed Plaintiff's claims : Count III, Violation of Unfair Insurance Practices Act; Count IV, Violation of Unfair Trade Practices Act; and Count V, Negligence. *See* MEMORANDUM OPINION AND ORDER (Doc. 181) (MOO).

faith.

On January 17, 2020, Plaintiff filed a motion for partial summary judgment asking the Court to determine the principal-agent relationship between Defendant and two non-parties, BGA Insurance and Luis Miguel Sisniega (Sisniega).[3] Defendant responded, asserting that the issue of the principal-agent relationship between Defendant and the non-parties was not relevant to the issues before the Court.[4] Plaintiff replied on February 14, 2020.[5]

On January 21, 2020, Defendant filed a motion for summary judgment asking the Court to grant summary judgment on Plaintiff's two remaining counts.[6] In opposition, on February 6, 2020, Plaintiff responded, stating there are disputed material facts that foreclose summary judgment.[7] On February 21, 2020, Defendant replied.[8]

The Court will deny Plaintiff's PSJ Motion as there are disputed issues of material fact about whether the non-parties functioned as brokers or agents when Mr. Salopek applied for a life insurance policy with Defendant. The Court will deny in part and grant in part Defendant's SJM as to Count I, Breach of Contract, and Count II, Bad Faith. As to Plaintiff's Breach of Contract claim, whether Mr. Salopek made material misrepresentations that Defendant relied on

---

[3] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PRINCIPAL-AGENT RELATIONSHIP BETWEEN DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY, BGA INSURANCE AND LUIS MIGUEL SISNIEGA (Doc. 191) (PSJ Motion).
[4] DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 200) (Response to PSJ).
[5] PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PRINCIPAL-AGENT RELATIONSHIP BETWEEN DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY, BGA INSURANCE, AND LUIS MIGUEL SISNIEGA (Doc. 215) (Reply to PSJ).
[6] DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. 193) (SJM). Defendant's SJM was redacted. On February 24, 2020, Defendant filed an unredacted version with the same title (Doc. 235). The Court will refer to the unredacted version as Unredacted SJM.
[7] PLAINTIFF MARCIE SALOPEK, TRUSTEE FOR THE SALOPEK FAMILY HERITAGE TRUSTS' RESPONSE TO ZURICH AMERICAN LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. 203) (Response to SJM).
[8] DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DOC. 228) (Reply to SJM).

when issuing the policy depends, in part, on the circumstances at the time of the Application. The Court will grant Defendant's SJM as to Count II, Bad Faith; Plaintiff has not shown that there are disputed issues of material fact on this claim.

## I.    FACTS & PROCEDURAL HISTORY

The following facts are uncontroverted:

In southern New Mexico, the Salopek family runs one of the largest pecan farms in the southwest. At some point, Tony Salopek (Tony) put the pecan farm in a trust which provides that only his male descendants could inherit and control the farm. Complaint (Doc. 1-1) ¶ 24. Tony's three sons, who have both sons and daughters, wanted to correct the unfairness to their daughters. *Id.* at ¶¶ 25, 26, 27. To make their children's inheritance more equitable, in 2015, the three sons created the Salopek Family Heritage Trust (SFHT), an entity from which their daughters could inherit in amounts equal to the males' inheritance in the pecan farm. *Id.* ¶ 28. Insurance policies funded SFHT. *Id.*

In 2015, the same year SFHT was created, Mr. Salopek decided to acquire new life insurance policies. He filled out applications for a new life insurance policy in the amount of $15,000,000. Complaint (Doc. 1-1) ¶ 31.

On August 14, 2015, Mr. Salopek applied to Minnesota Life for life insurance. Unredacted SJM, Ex. 21 (Doc. 235-21). Insurance agent Ahmed Hashemian (Hashemian) prepared the application. Complaint (Doc. 1-1) ¶ 36. His application included information that his father, Tony, died at age 64 of cirrhosis and his mother died at age 72 of pancreatic cancer. Unredacted SJM, Ex. 21 (Doc. 235-21) at 3.

After conducting a physical examination and an evaluation of Mr. Salopek's medical records, Minnesota Life rejected Mr. Salopek's application on November 3, 2015. Complaint

(Doc. 1-1) ¶ 38. Minnesota Life stated that it would reconsider the application if Mr. Salopek obtained a complete physical with a prostate screening test and a colonoscopy. *Id.*

The record indicates that another insurance company, Ameritas, also denied Mr. Salopek's application at some time during this period. But, the record does not show when Ameritas denied his application or why. *Id.* ¶ 41.

A Medical Information Bureau (MIB) records information provided by life insurance companies about their rejection of applicants and the reasons for the rejection. All life insurance companies may access that MIB information. Minnesota Life recorded its rejection of Mr. Salopek's application in MIB. *Id.* ¶ 39.

The day after the rejection by Minnesota Life, someone completed a life insurance application for submission to Defendant (Application) for life insurance for Mr. Salopek. *Id.* ¶ 40. The Application has three parts: Part 1, Part II, and an Alcohol and Drug Questionnaire (Questionnaire). Unredacted SJM, Ex. 1 (Doc. 235-2) (Part I); Ex. 2 (Doc. 235-3) at 3 (Part II); Ex. 10 (Doc. 235-10) (Questionnaire).[9] The Application identified the owner and beneficiary of the policy as SFHT. *Id.*, Ex. 1 (Doc. 235-2) at 3.

All three parts are signed by Mr. Salopek and dated November 4, 2015. *Id.*, Ex 1 (Doc. 235-2) at 7; Ex. 2 (Doc. 235-3) at 3; Ex. 10 (Doc. 235-10) at 3. Marcie Salopek also signed Part I. *Id.*, Ex. 1 (Doc. 235-2) at 7.

Part I of the Application disclosed that Mr. Salopek had been rejected for life insurance by Minnesota Life and by Ameritas. *Id.*, Ex. 1 (Doc. 235-2) at 4. Part I, Section F of the Application requested some preliminary information about Mr. Salopek's tobacco and alcohol use. *Id.* With respect to his tobacco use, question 1 asked Mr. Salopek:

---

[9] When citing to documents filed by the parties, the Court will use the number time stamped by the court filing system rather than the number on the document.

> Have you ever used tobacco or nicotine products in any form (e.g., cigars, cigarettes, cigarillos, pipes, chewing tobacco, nicotine patches or nicotine gum? If "Yes", please provide details.

*Id*. Underneath the question were three categories for Mr. Salopek's response entitled Product(s), Frequency/Amount, and Date last used. In the spaces provided, Mr. Salopek wrote in each category: the product he used was "chewing tobacco"; he used it "now and then mostly on hunting trips"; and the date he had last chewed tobacco was in 2009. *Id.* Question 5 of this section asked if the applicant had been treated for alcohol abuse. *Id.*[10] In answer to this question, Mr. Salopek checked "No." *Id.*

Both Mr. Salopek and his wife signed Part I of the Application. The signature portion of the application included the following paragraph:

> I (we) have read all the questions and answers in the Application, including all required parts. All responses are true and complete to the best of my (our) knowledge and belief. I (we) promise to tell Zurich American Life Insurance Company of any change in the health or habits of the Proposed Insured that occurs after completing this Application, but before the policy is delivered to me(us) and the first premium is paid. I (we) agree:
>     1. This application, including all of its parts, statements and answers will be the basis for and form part of the policy, if issued, and no information will be considered to have been given to Zurich American Life Insurance Company unless it is stated in the Application.

*Id.* at 7. Above the signature line on Part I of the Application is the following statement: "Fraud Warning: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law." *Id.* The signatures are dated November 4, 2015. *Id.* Sisniega is listed as the witnessing broker. *Id.*

Section J of the Application identifies Sisniega as the Broker who prepared the

---

[10] The question reads: "Have you ever received medical treatment or counseling for, or been advised by a physician to reduce or discontinue the use of alcohol or prescribed or non-prescribed drugs? . . . If 'Yes,' complete the Alcohol and Drug Use Questionnaire." Unredacted SJM, Ex. 1 (235-2) at 4.

Application. *Id.* at 8. Above the signature line in this section is the statement: "I have personally reviewed this Application for appropriateness of sale. I was appropriately licensed and appointed on the date the Application was signed." *Id.* Sisniega signed this section and dated it November 4, 2015. *Id.*

Part II of the Application asked the applicant to elaborate about any "yes" answers on page 2 of Part I and asked some additional medical history questions. Unredacted SJM, Ex. 2 (Doc. 235-3) at 2. In response to the question, "Have you been diagnosed or been treated by a physician for: Cancer, tumor, poly, or disorder of the skin or breast?" Mr. Salopek checked "No." *Id.* Mr. Salopek also checked "no" to a question asking if he had ever "[b]een treated or counseled for alcoholism or drug abuse." *Id.* Finally, Mr. Salopek denied smoking cigarettes or using tobacco within the last five years. *Id.* Above the signature line for Part II is the following statement:

> I declare that I have made no statement to the medical examiner, agent, or any other person connected with the Company that in any way qualifies or modifies the above answers and statements. I have read and confirm that the above answers and statements are complete and true to the best of my knowledge and belief. I understand that any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

*Id.* at 3. Only Mr. Salopek signed Part II of the Application, and it is dated November 4, 2015. *Id.*

Defendant asked Mr. Salopek to fill out an Alcohol Questionnaire as a condition for him to receive coverage. SJM, Ex. 9 (Doc. 193-11) at 3. The Questionnaire asked additional questions about Mr. Salopek's alcohol use. Unredacted SJM, Ex. 10 (Doc. 235-10). On the Questionnaire, Mr. Salopek indicated that usually he drank 1-2 beers daily and that the date of his last drink was November 2, 2015. *Id.* at 2. He also checked "no" to the question asking

whether he had "ever consulted a doctor or received treatment because of your alcohol use." *Id.* Above Mr. Salopek's signature, is this statement: "I represent that the answers to the questions above are to the best of my knowledge, true and complete. I agree that they will form a part of my application and the policy, if issued." *Id.* at 3. The signature is dated November 4, 2015.

Mr. Salopek signed a release permitting Defendant to obtain all his insurance and medical information. Complaint (Doc. 1-1) ¶ 46. Defendant did not require Mr. Salopek to undergo a new examination or blood testing but relied on the August 14, 2015 medical examination conducted for Mr. Salopek's application with Minnesota Life. *Id.* ¶ 48.

On December 15, 2015, Defendant issued a Life Insurance Policy (Policy) numbered 200436 on Mr. Salopek's life in the amount of $15,000,000 to be paid on his death to SFHT. *See* Complaint (Doc. 1-1) at ¶ 49; Unredacted SJM, Ex. 31 (Doc. 235-29) at 7. The initial premium for the Policy was $405,915. Complaint (Doc. 1-1) ¶ 49. The Policy was classified as Premium Class: Standard Plus Non Tobacco. Unredacted SJM, Ex. 31 (Doc. 235-29) at 7.

The Policy contained an incontestability clause. *Id.* at 33 The incontestability clause stated that the Policy would not be contested "after it has been in force during the life of the Insured for two years from the Issue Date, except for fraud (when permitted by the law of the state where the policy is delivered) and the non-payment of premium." *Id.*

The Policy went into effect on December 15, 2015. *Id.* at 7. On behalf of the SFHT, Marcie Salopek signed a delivery receipt dated December 14, 2015, indicating that she had received the Policy numbered 200436. SJM, Ex. 32 (Doc. 193-4) at 2.

In January 11, 2016, Mr. Salopek had severe stomach pains and went to MountainView Regional Medical Center. Complaint (Doc. 1-1) ¶ 51; *see also* Unredacted SJM. Ex. 11 (Doc. 235-11) (medical record of visit on January 11, 2016). On January 15, 2016, he had exploratory

surgery, which resulted in a diagnosis of metastatic colon cancer. Complaint (Doc. 1-1) ¶ 51. He

died on August 21, 2016. Unredacted SJM, Ex. 33 (Doc. 235-30) at 15.

The family submitted a claim on Defendant's Policy to BGA Insurance. *Id.*, Ex. 33 (Doc.

235-30) at 2, 8. The claim is dated September 12, 2016. *Id.* at 10. But the claim was not

forwarded to Defendant until September 20, 2016. *Id.* at 2. Defendant conducted a Policy claims

review. *Id.*, Ex. 34 (Doc. 235-31), Ex. 37 (Doc. 235-34).

On December 6, 2016, Marcie Salopek signed a form, witnessed by Defendant's claims

investigator Patrick Goodrich, that Mr. Salopek used tobacco on and off until one month before

he was diagnosed with cancer. Unredacted SJM, Ex. 7 (Doc.235-8) at 2.

Defendant's claims investigator Patrick Goodrich also interviewed Marcie Salopek, on

December 20, 2016. *Id.*, Ex. 15 (Doc. 235-15). During the interview Marcie Salopek addressed

Mr. Salopek's alcohol and tobacco use. Marcie Salopek stated that he used chewing tobacco on

and off and that he had not been using chewing tobacco for an undefined period before he was

diagnosed with cancer. *Id.* at 8. When asked about her husband's alcohol use, Marcie Salopek

stated "sometimes Mark would drink four or five beers, and sometimes he'd drink you know, 12,

16 beers." *Id.* at 9. She confirmed that over the years it had been his habit to drink in that

manner. *Id.* Finally, Marcie Salopek confirmed Mr. Salopek's 2013 skin cancer, surgery, and

treatment. *Id.* 9-10.

On January 13, 2017, within the two-year contestability period, Defendant denied the

claim on the Policy. *Id.*, Ex. 36 (Doc. 235-53). In its letter, Defendant identified three

inconsistencies in Mr. Salopek's Application:

1.    An inconsistency between Mr. Salopek's saying that he used chewing
      tobacco and "dip now and then" and the "No" that was checked on another
      page denying other tobacco use.
2.    Mr. Salopek's claim in his application that he drank one or two beers a day

at the time of the application was inconsistent with representations of his previous alcohol use.

3    Mr. Salopek's failure to disclose the removal of a skin cancer in July 2013, which Defendant stated should have been disclosed in response to a question about "Cancer, tumor, polyp or disorder of the skin or breast."

Complaint (Doc. 1-1) ¶ 62; Unredacted SJM, Ex. 36 (Doc. 235-33) at 2-4. Defendant indicated that complete and correct responses to Point 1 and Point 2 would have made it decline the risk, but Defendant did not cite the skin cancer as a reason supporting rescission. Unredacted SJM, Ex. 36 (Doc. 235-33) at 2-4. Defendant issued a refund check to Plaintiff for the sole premium payment on the Policy. *Id.* Plaintiff did not cash the check.

On March 6, 2018, Plaintiff filed a Complaint in New Mexico state court against Defendant, alleging the following counts: Count I, Breach of Contract; Count II, Bad Faith Insurance Conduct; Count III, Violation of Unfair Insurance Practices Act; Count IV, Violation of Unfair Trade Practices Act; Count V, Negligence.

On April 11, 2018, Defendant removed the case to federal court based on diversity under 28 U.S.C. § 1332.[11] On April 11, 2018, Defendant answered the Complaint.[12] On July 7, 2018, Plaintiff filed a motion seeking to amend the Complaint to add an additional count of civil conspiracy and to join three additional Defendants, Hashemian, Capital Aspects, LLC, and Sisniega.[13] A second motion to amend, filed on September 17, 2018, requested joinder of another Defendant, BGA Insurance.[14]

On March 28, 2019, the Court denied both of Plaintiff's motions to amend.[15] The Court

---

[11] *See* NOTICE OF REMOVAL (Doc. 1).
[12] *See* DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT (Doc. 10).
[13] *See* PLAINTIFF'S MOTION FOR JOINDER AND FOR LEAVE TO FILE AMENDED COMPLAINT TO ADD FACTUAL ALLEGATIONS AGAINST CAPITAL ASPECTS, LLC, A NEW MEXICO COMPANY, AHMAD HASHEMIAN, AND MIGUEL LUIS SISNIEGA (Doc. 38).
[14] *See* PLAINTIFF'S SECOND MOTION FOR JOINDER AND FOR LEAVE TO FILE SECOND AMENDED COMPLAINT TO ADD BGA INSURANCE (Doc. 53).
[15] MEMORANDUM OPINION AND ORDER (MOO) (Doc. 109).

concluded that Plaintiff's second motion to amend was untimely. *See* MOO (Doc. 109) at 9. With respect to Plaintiff's first motion to amend, the Court found that it was improper because "all essential facts that would have supported Plaintiff's claim of civil conspiracy were known to Plaintiff when she filed the Complaint," and therefore, Plaintiff had not shown the joinder was proper. *Id.* at 13-14.

On June 24, 2019, Defendant filed a motion seeking judgment on the pleadings as to Counts III, IV and V of the Complaint.[16] On December 11, 2019, the Court granted Defendant's Motion.[17]

## II.    APPLICABLE LAW

Both Defendant and Plaintiff seek summary judgment on certain claims in this diversity case. "[I]n a federal diversity action, the district court applies state substantive law—those rights and remedies that bear upon the outcome of the suit—and federal procedural law—the processes or modes for enforcing those substantive rights and remedies." *Los Lobos Renewable Power, LLC v. Americulture, Inc*., 885 F.3d 659, 668 (10th Cir. 2018). This mean that when considering a summary judgment motion a federal judge "will look to [state law] to determine what elements the plaintiffs must prove at trial to prevail on their claims" but "exclusively to federal law to determine whether plaintiffs have provided enough evidence on each of those elements to withstand summary judgment." *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1129 (10th Cir. 2009) (internal citations omitted).

A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[16] DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS III, IV, AND V OF THE COMPLAINT (Doc. 123).
[17] MOO (Doc. 181).

Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "Once the moving party has met its burden, the burden shifts back to the nonmoving party to show that there is a genuine issue of material fact." *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993) (citing *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)). Disputes are genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and they are material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (further citation and internal quotation marks omitted). "A plaintiff 'cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor.'" *Milne*, 575 F.3d at 1130 (quoting *Turner v. Public Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009) (further citation omitted)).

## III    ANALYSIS

Plaintiff seeks partial summary judgment on the principal-agent relationship between Defendant and two non-parties, BGA Insurance and Sisniega. Defendant asks for summary judgment on the remaining two claims in Plaintiff's Complaint: Count I, Breach of Contract, and Count II Bad Faith Insurance Conduct. The Court will first address Plaintiff's motion.

### A.  Plaintiff's Motion for Partial Summary Judgment on the Principal-Agent Relationship

Plaintiff asks that the Court grant summary judgment on the issue of whether Sisniega and BGA Insurance were agents of Defendant. This is material because if Sisniega and/or BGA Insurance were agents of Defendant, then any knowledge they had about misrepresentations in the Application could potentially be imputed to Defendant. In opposition, Defendant denies an

agency relationship with either, stating that both Sisniega and BGA Insurance were brokers, not agents.

BGA Insurance's relationship with Mr. Salopek was through Sisniega, so Plaintiff's claims focus on Sisniega's status during the life insurance application process. Plaintiff's argument rests on Sisniega's New Mexico 2014 licensure, which lists Sisniega as Defendant's agent. PSJ Motion (Doc. 191-1) at 11 (National Insurance Producer Register identifying Sisniega as a Zurich agent).[18] An agent in New Mexico is:

> a person appointed by an insurer authorized to transact insurance in this state, to solicit applications for insurance or annuity contracts on its behalf, to countersign insurance policies or contracts if expressly so authorized by the insurer, and to perform such other services relative to such transactions as the insurer may authorize.

N.M. Stat. Ann. § 59A-12-2(A) (1978) (amended 2016). Defendant's contract with Sisniega did not appoint him as an agent but authorized him to act only as a broker. Response to PSJ, Ex. 3 (Doc. 200-4) (Application for Contracting and Appointment); Unredacted SJM Ex. 1 (Doc. 235-2) at 7, 8 (Sisniega's signature as broker and witnessing broker). New Mexico law defines a broker as:

> a person generally who, not being an agent of the insurer, as an independent contractor and on behalf of the insured solicits, negotiates or procures insurance or annuity contracts or renewal or continuation thereof for insureds or prospective insureds other than himself.

N.M. Stat. Ann. 59A-12-3(A) (1978) (amended 2016).[19] The broker definition does not require a broker to be appointed by an insurer but defines "broker" in the negative as not an agent.

According to Plaintiff, because in 2014, Sisniega was licensed as an agent for Defendant in New Mexico, Sisniega could only engage in insurance transactions in New Mexico as Defendant's agent. Defendant counters that Sisniega is not its agent because, although he may

---

[18] There is no evidence that BGA Insurance was licensed in New Mexico.
[19] Mr. Salopek made the Application and Defendant issued the Policy in 2015. The applicable statutes are the versions then in effect.

have been licensed as an agent, Defendant did not "appoint" Sisniega to function as its agent but appointed him only as its broker. Defendant makes a valid argument.

In 2014, § 59A-12-12 (amended 2016) of the New Mexico Insurance Code was entitled "General Qualifications for individual agent, broker or solicitor." While this statute applied both to agents and brokers, it did not separately delineate licensing requirements for agents and brokers but grouped them:

> For the protection of the public in New Mexico, the superintendent shall not issue, continue or permit to exist a license to an individual as agent, broker or solicitor except as to an individual qualified as follows: …D. if for license as an agent, must be appointed as an agent by an authorized insurer, subject to issuance of a license . . ..

N.M. Stat. Ann. § 59A-12-12(D) (1978) (Qualifications Statute). The language of the Qualifications Statute did not suggest that a designation as an "agent" on a New Mexico license was determinative of how an individual operates in New Mexico. Significantly, nothing in the 2014 New Mexico Insurance Code required or provided for separate or different licensure for brokers.[20] Rather, it appears that in 2014, an individual may have been licensed as an agent, but how that individual actually functioned depended not on his or her license, but on whether, an insurer "appointed" that individual as its agent.

The New Mexico statute explaining the relationship between insurers, brokers, and agents further underscores this point. As this statute explains:

> Any licensed agent *appointed as an agent by an insurer* shall, in any controversy between the insured or his beneficiary and the insurer, be held to be the agent of the insurer which issued the insurance solicited or applied for, anything in the application or policy to the

---

[20] In her argument, Plaintiff uses the 2016 amended New Mexico Insurance Code, which did not go into effect until 2017 and therefore, does not govern the requirements that existed when Sisniega obtained his 2014 license. But, even if the amended code were applicable, its provisions would not help Plaintiff. In the amended code, the term "agent" is replaced with the term "insurance producer," which is defined as "a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance." N.M. Stat. Ann. § 59A-12-2(E) (1978). A broker is defined as "a type of insurance producer." § 59A-12-2(A). All individuals that "sell, solicit or negotiate insurance" in New Mexico are required to have a license. § 59A-12-4. The required insurance producer license applies to both agents and brokers and is not separately categorized by law. § 59A-12-12. In 2017, Sisiega's New Mexico licensure identifies him as an insurance producer. PSJ Motion (Doc. 191-1) at 12.

contrary notwithstanding; and any broker licensed to transact insurance business in this state, in any controversy between any insured or his beneficiary and the insurer issuing the insurance through its licensed agent at request of the broker, shall be held to be the agent of the insured, anything in the application or policy to the contrary notwithstanding unless *under particular circumstances* it is found that the broker is representing the insurer. This section shall not apply . . . to acts of the agents in fraud or attempted fraud of the insurer or acts of the broker in fraud or attempted fraud of the insured.

N.M. Stat. Ann. § 59A-18-24 (1978) (amended 2016) (emphasis added) (Relationship Statute).

Significantly, the Relationship Statute refers to an agent as a "licensed agent appointed as an agent." The language of the statute elucidates that to be an agent of an insurer in New Mexico, an individual must be both licensed as an agent and appointed as an agent. In contrast, a broker is an individual "licensed to transact business in the state."

The Relationship Statute also explains the difference between an agent and broker in a transaction between an insured and an insurer. As delineated in the Relationship Statute, an agent represents an insurer, while an insurance broker represents the insured. § 59A-18-24; *Barth v. Coleman*, 878 P.2d 319, 325 (N.M. 1994) (citing 16 John A. Appleman & Jean Appleman, Insurance Law & Practice § 8725, at 333 (Rev.Vol. 1981) (further citation omitted). But, as the Relationship Statute acknowledges, a broker may have a dual role. See *Barth*, 878 P.2d at 326 (explaining broker's role). Under "certain circumstances" a broker may function for some purposes as the agent for the insurer, and under other circumstances, as a broker who represents the insured or applicant. *Id.* Whether an insurance salesman functions as an agent or a broker is a factual issue highly dependent on the "particular circumstances" of the transactions. *Id.*; N.M. Stat. Ann. § 59A-18-24 (1978) (amended 2016) (a broker represents the insured unless "particular circumstances" establish otherwise). Especially relevant in determining whether an insurance salesman behaved as a broker or as an agent in a transaction is the applicant's reasonable expectations. *See Barth*, 878 P.2d at 324 (holding that the insured's reasonable

expectations were created by the intermediary brokers involved in the transaction and therefore, the insurer should bear the burden from any miscommunication made by those intermediaries).

Plaintiff argues that circumstances indicate that Sisniega and BGA Insurance were Defendant's agents.[21] She states that this is established because Sisniega and BGA received the premiums from Mr. Salopek and delivered the Policy to Mr. Salopek. But the identity of the entity that received the premiums and the entity that delivered the policy are only two factors in a greater inquiry. Alone, these facts cannot and do not suggest that Mr. Salopek believed that Sisniega or BGA Insurance were agents that represented his interests. *Cf. Barth,* 878 P.2d at 324 (observing "'relationships between insurance companies and sales representatives in regard to the authority to contract on behalf of insurers have been established in a multitude of patterns that often cannot be accurately described or characterized by the terms that are generally used to define relationships in agency law.'") (quoting Robert E. Keeton & Alan I. Widiss, Insurance Law § 2.5(b), at 81 (1988)).

For similar reasons, Defendant's argument that its contract with Sisniega and BGA Insurance defining them as Defendant's brokers does not resolve this question. While a contractual relationship is also a factor that bears weight, it cannot alone establish how BGA Insurance and Sisniega functioned in the transaction with Mr. Salopek. What is relevant here is the role Sisniega and BGA Insurance played under the specific circumstances surrounding the completion of the Application.

Partial summary judgment is inappropriate on this issue as the circumstances surrounding

---

[21] Plaintiff also alleges that the following facts, if true, are also important: 1) Sisniega never met Marcie Salopek or Mr. Salopek; 2) Hashemian filled in the Application; 3) Defendant denied Hashemian's application to be its agent or broker; 4) Sisniega did not research the Application; 5) BGA knew of Hashemian's involvement with the Application and that Defendant had rejected Hashemian as an agent or broker; 6) BGA paid the commission for the Policy to Hashemian and not Zurich. See PSJ (Doc. 191) at 2. But Plaintiff does not explain how these facts are relevant. She has not indicated how these alleged factors impacted or created a misconception as to Mr. Salopek's perception of the Policy or the Application process.

the Application process and the representations made during that process are factual issues for a jury.

### B. Defendant's Motion for Summary Judgment

### Count 1: Breach of Contract

Plaintiff argues that when Defendant rescinded the Policy on the grounds of material misrepresentation, Defendant breached its contract with Plaintiff. A policy of insurance is a contract and is "construed by the same principles governing the interpretation of all contracts." *Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1210 (N.M. 1995) (citing *Vargas v. Pac. Nat'l Life Assurance Co.*, 441 P.2d 50, 53 (1968)). Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages." *Abreu v. New Mexico Children, Youth & Families Dep't*, 797 F.Supp.2d 1199, 1247 (D.N.M. 2011) (further citation omitted).

Defendant states that Plaintiff cannot prove "the existence of a contract" because "material misrepresentations" in the Application regarding Plaintiff's alcohol and tobacco use made the Policy void from the onset. SJM (Doc. 193-1) at 16-20. Rescission of an insurance policy is "allowed where there has been a misrepresentation of material fact, the misrepresentation was made to be relied on, and has in fact been relied on." *Prudential Ins. Co. of Am. v. Anaya*, 428 P.2d 640, 643 (N.M. 1967). The insurer carries the burden of proving that the insured's misrepresentation is "sufficient to avoid its liability on the contract. *Crow*, 891 P.2d at 1212 (citing *Tsosie v. Found. Reserve Ins. Co.*, 427 P.2d 29, 31 (1967)).

*1. Whether Mr. Salopek's use of tobacco or alcohol was material to the contract.*

"A misrepresentation on an insurance application is material if the insurer would not have entered into the contract but for the misrepresentation." *Crow,* 891 P.2d at 1212; *see also*

*Modisette v. Found. Reserve Ins. Co.*, 427 P.2d 21, 26 (1967). Defendant asserts that Mr.

Salopek's use of tobacco and alcohol was material to Defendant's decision whether to issue the

Policy. Neither party disputes that the amount and frequency of an insured's use of alcohol and

tobacco impacts both an insurer's decision to issue a policy and the premiums the insurer charges

for that policy. So, Mr. Salopek's actual use of tobacco and alcohol was material.

2. *Whether Mr. Salopek misrepresented his use of alcohol or tobacco in his Application*

Mr. Salopek stated on his Application he used 1-2 beers a day. This assertion is

contradicted by various medical records and testimony that indicates that Mr. Salopek drank

significantly more. Some evidence suggests that Mr. Salopek drank up to 6 beers a day. *See*

Unredacted SJM, Ex. 12 (Doc. 235-12) at 2 (medical chart note recording 6 daily beers); *see also*

Ex. 5 (Doc. 235-6) (deposition of Adam Salopek stating that Mr. Salopek drank between 1 to 6

beers at their daily meeting). Other medical records and testimonial evidence suggest that Mr.

Salopek drank as many as 12 to 16 beers a day.[22] *Id.*, Ex. 15 (Doc. 235-15) at 9 (transcription of

Marcie Salopek's interview with Defendant's claims examiner Patrick Goodrich). Additionally,

Mr. Salopek's 2016 medical records diagnose him with alcohol abuse. *Id.*, Ex. 11 (Doc. 235-11)

at 2; Ex. 12 (Doc. 235-12) at 2; Ex. 13 (Doc. 235-13) at 2.

The amount of tobacco Mr. Salopek used is also controverted. Mr. Salopek indicated on

his Application that in the past five years he used chewing tobacco now and then on hunting trips

with his brothers, but that he had not used it since 2009. Testimonial evidence from his family

suggests that Mr. Salopek did not discontinue chewing tobacco in 2009 and that he used more

chewing tobacco than stated in his Application. *See id.*, Ex. 3 (Doc. 235-4) at 4-6 (deposition of

---

[22] There is also evidence that Mr. Salopek was in an alcohol treatment center in Arizona in the 1990s. But this evidence was not before Defendant, and Defendant did not cite it as a reason for rescinding the Policy.

Dustin Salopek stating that Mr. Salopek used Copenhagen chewing tobacco regularly through 2015 although there were intervals when he discontinued use); Ex. 4 (Doc. 235-5) at 3-5 (deposition of Heather Salopek stating that her father chewed Copenhagen chewing tobacco regularly from 2009 through 2016 although he would sometimes stop for short periods); Ex. 5 (Doc.235-6) (deposition of Adam Salopek stating that after 2011, he witnessed Mr. Salopek chew tobacco during office meetings and after meals). Defendant argues that these inconsistences between Mr. Salopek's Application, his medical records, and testimonial evidence are prima facie proof that Mr. Salopek misrepresented his use of alcohol and tobacco. Plaintiff disagrees.

Plaintiff argues contradictory positions here. On the one hand, Plaintiff states that the insurance company possessed significant evidence, which she calls "red flags," indicating that Mr. Salopek misrepresented his alcohol and tobacco use. According to Plaintiff, these red flags put Defendant on notice about Mr. Salopek's true alcohol and drug use. Response to SJM (Doc. 2013) at 20; *see also* Unredacted SJM, Ex 22 (Doc. 235-22) at 11 (a medical record from Southwest Heart, P.C. that was part of Defendant's underwriting records, states that Mr. Salopek is "a gentleman who has been utilizing excessive amounts of alcohol intermittently"); Response to SJM (Doc. 203) at 19 (arguing that the MIB reports in Defendant's possession showed abnormal alcohol markers). On the other hand, Plaintiff contends that the evidence supports Mr. Salopek's answers concerning his use of alcohol and tobacco. *See, e.g.,* Response to SJM (Doc. 203) ¶¶ 1, 2, 3 (disputing that Mr. Salopek chewed tobacco on a regular basis and that he had a history of chronic alcohol abuse).

Defendant states that it gathered relevant information when underwriting the Application and that the evidence it relied on did not indicate that Mr. Salopek used alcohol or tobacco in

amounts more than what he represented. In short, there are significant disputes about how much alcohol or tobacco Mr. Salopek used and whether his Application records his use correctly. The Court concludes that the inconsistencies between the Application, the medical records, and the testimonial evidence are issues of fact that should be weighed by a jury.

### 3. Did Defendant rely on Ms. Salopek's representations about his use of alcohol or tobacco.

It is uncontroverted that Mr. Salopek signed an Application that stated he used alcohol and tobacco in amounts at odds with other evidence. It is also uncontroverted that in signing the Application, Mr. Salopek affirmed that he had read the Application and that all information was true. At issue is, if the Application did contain misrepresentations, did Defendant have information within Defendant's possession that put Defendant on notice so that Defendant could not have reasonably relied on the information in the Application. *See Ellingwood v. N.N. Inv'rs Life Ins. Co.*, 805 P.2d 70, 77 (N.M. 1991) ("[W]hen an applicant gives sufficient information to alert an insurance company to his particular medical condition or history, the company is bound to make such further inquiry as is reasonable under the circumstances in order to ascertain the facts surrounding the information given.").

Plaintiff argues that Defendant could not reasonably have relied on Mr. Salopek's Application for two principal reasons. First, Plaintiff argues that Defendant unreasonably rushed underwriting the Application and should have spent more time investigating, because then Defendant might have discovered relevant information. This argument has no merit.

The Court has resolved this issue. In previous proceedings, the Court held that in New Mexico, there is no underwriting duty of care and Defendant had no duty to obtain any specific information.[23] What is relevant is whether Defendant reasonably relied on the information it had

---

[23] *See* MOO (Doc. 181).

when evaluating Mr. Salopek's Application.

Second, Plaintiff argues that if there were misrepresentations, Defendant could not have reasonably relied on them when rescinding the Policy because Sisniega and BGA Insurance were Defendant's agents and their knowledge and actions are imputed to Defendant. New Mexico courts have found that when an insurance company's agent puts information in an application that is inconsistent with that agent's actual knowledge, an insurer may have imputed knowledge of that alleged misrepresentation. *See Jackson Nat. Life Ins. Co. v. Receconi*, 827 P.2d 118, 127 (N.M. 1992) (holding "notice to an agent, or knowledge imparted to him, is notice to the company, regardless of whether or not the agent actually communicates the information to the company") (further citation omitted). Imputed knowledge of a misrepresentation may estop an insurance company from rescinding a contract because such knowledge vitiates an insurer's claim of reliance or that the misrepresentation was material. *Ellingwood*, 805 P.2d at 71. Whether an insurance company has either actual or imputed knowledge is a factual issue for the jury. *Id.*

According to Plaintiff, when Mr. Salopek and Marcie Salopek signed the Application, it had not yet been filled out and that Mr. Salopek did not record the answers on the Application. Plaintiff alleges that either an employee of Hashemian or Sisniega filled out the forms. Plaintiff also contends that when there was a question as to the accuracy of the answers, Defendant relied on representations made by BGA Insurance rather than speaking with Mr. Salopek. Finally, Plaintiff argues that Sisniega did not review the completed Application with Mr. Salopek to make sure that everything in it was true. Response to SJM (Doc. 203-2) at 1 (Affidavit of Marcie Salopek stating that neither she nor her husband ever met Sisniega). Therefore, any misrepresentations on the Application, Plaintiff argues, are misrepresentations that arose because

Sisniega inaccurately affirmed already recorded information. Plaintiff concludes that Sisniega's knowledge and/or actions estop Defendant from claiming reliance on any misrepresentations on the Application in denying payment of Policy benefits.

Defendant counters that Sisniega was not Defendant's agent, but instead was a broker who represented Mr. Salopek in the preparation of the Application. Defendant also correctly argues New Mexico law does not presuppose knowledge of a misrepresentation just because an insurance salesman filled out an application. *See John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 505 (10th Cir. 1994) (interpreting New Mexico law and holding that when an agent records an applicant's answers that the applicant affirms, the agent is not responsible for the misrepresentation just because the agent filled out the form). Here, Defendant alleges that the facts indicate that Sisniega met with Mr. Salopek and reviewed the information on the Application, which Mr. Salopek affirmed. Unredacted SJM, Ex. 33 (235-50) at 6 (September 12, 2016 questionnaire by Sisniega stating he met with Mr. Salopek, discussed coverage, and went over Application). Finally, Defendant notes that there is no dispute that Mr. Salopek signed the Application affirming that he had read the Application and all the information was correct.

Clearly, the parties disagree about Sisniega's relationship to Defendant and his relationship to Mr. Salopek. The parties also disagree about what Sisniega knew and the circumstances under which the Application was completed. Competing evidence about whether Mr. Salopek made misrepresentations in his Application and whether Defendant relied on them when deciding whether to issue the Policy means that factual issues are in dispute. Factual issues are for a jury to weigh and decide, and so the Court will deny summary judgment on Count I, Breach of Contract.

## Count II: Bad Faith Insurance Conduct

"[U]nder the contract of insurance, there is an implied covenant of fair dealing which creates an obligation between the parties to act in good faith. New Mexico recognizes this duty of good faith between insurer and insured." *Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 690 P.2d 1022, 1024 (N.M. 1984). (internal citation omitted). "'Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'" *Watson Truck & Supply Co., Inc. v. Males*, 801 P.2d 639, 642 (N.M. 1990) (quoting *Romero v. Mervyn's*, 784 P.2d 992, 1000 (N.M. 1989) (further citation omitted)). "Fair dealing is the obligation to act honestly and in good faith in the performance of the contract." UJI-1701 NMRA; see also *Progressive Cas. Ins. Co. v. Vigil,* 413 P.3d 850, 858 (N.M. 2018) *reh'g* granted (Mar. 6, 2018). In New Mexico, bad faith in the context of an insurance contract focuses on how an insurer handles a policy claim.

Defendant asks for summary judgment on Plaintiff's Bad Faith claim, arguing that Plaintiff has not provided any evidence that it was unreasonable for Defendant to deny the claim or that its investigation of the claim was conducted in bad faith. In the Complaint, Plaintiff alleges that Defendant acted in bad faith on six bases.[24] These allegations fall into three categories: 1) allegations regarding pre-Policy events; 2) allegations that Defendant's denial of Plaintiff's claim was unfounded; 3) allegations that Defendant investigated the claim in bad faith.

---

[24] In the Complaint, Plaintiff alleges:

    a. Misrepresenting to Mark Salopek pertinent facts or policy provisions relating to the coverage at issue. [sic]

    b. Not conducting a proper, independent investigation before accepting the risk of coverage, but waiting to do such an investigation until after Mr. Salopek's death;

    c. Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiff's claim;

    d. Placing the interests of Zurich above the interests of the Salopek family;

    e. Upon information and belief, having in place a policy and practice of overly scrutinizing and denying life insurance claims where the insured dies within two years of obtaining coverage; and

    f. Failing to promptly provide Plaintiff a legitimate reason or explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of the claim.

Complaint (Doc. 1-1) ¶ 75(a)-(f).

### 1. Pre-Policy behavior is not a basis for a bad faith claim

A plaintiff may establish bad faith in two ways: 1) by showing that an insurer did not deal fairly with an insured in assessing a policy claim; and/or 2) by showing that an insured did not act in good faith in the performance of the contract.[25] *See Salas v. Mountain States Mut. Cas. Co,* 202 P.3d 801, 805 (N.M. 2009); *Am. Nat. Prop. & Cas. Co. v. Cleveland*, 293 P.3d 954, 958 (N.M. Ct. App. 2012). Plaintiff's claim that Defendant acted in bad faith when it failed to conduct "a proper, independent investigation before accepting the risk of coverage but waiting to do such an investigation until after Mr. Salopek's death" does not fall into either category. Complaint (Doc. 1-1) ¶ 75(b).

With this argument, Plaintiff posits that Defendant had a duty to conduct a certain type of investigation before accepting the risk of insuring Mr. Salopek. The Court has already ruled that Defendant did not have a duty to do an expansive investigation before accepting Mr. Salopek's Application. In the absence of that duty, the failure to do so cannot be evidence of bad faith. MOO (Doc. 181) (holding "as a matter of law Defendant does not owe an applicant an underwriting duty of care.").

### 2. Plaintiff has not met her burden in showing that there is a material issue of fact that Defendant acted in bad faith by its denial of Plaintiff's Policy claim

Next, Plaintiff argues that Defendant acted in bad faith when it put its interests above hers. First, Plaintiff argues Defendant misrepresented pertinent facts or policy provisions related

---

[25] *But see Progressive Casualty*, 413 P.3d at 857-58. In *Progressive*, the New Mexico Supreme Court discussed a special verdict form which further subdivided the good faith requirement into four categories: 1) an insurer's obligation to deal fairly with the insured; 2) an insurer's obligation not to deny a claim for frivolous or unfounded reasons; 3) an insurer's obligation to conduct a fair evaluation of coverage; and 4) an insurer's obligation to act honestly and in good faith in the performance of the contract. *Id.* For its discussion, the *Progressive* court then consolidated these four categories into three: 1) an obligation to deal fairly with the insured; 2) an obligation "to act reasonably under the circumstances to conduct a fair evaluation of coverage"; and 3) an insured's obligation to act honestly and in good faith in the performance of the insurance contract. *Id.* But generally, New Mexico courts have divided the obligation more broadly into an obligation to deal fairly with the insured in an assessment of the validity of a claim and an obligation to deal fairly with the insured in the investigation of a claim. *See, e.g., Salas*, 202 P.3d at 805; *Cleveland*, 293 P.3d at 958. The Court has used the broader categories here.

to the coverage at issue. An insurer does not deal fairly with an insured when the "insurer fails to disclose to its insured the existence of an exclusionary provision contained in the insurance contract." *Salas*, 202 P.3d at 805. This obligation means that an insurer has a duty to provide an insured with a "copy of the policy or some other documentation of its terms." *Salas*, 202 P.3d 807 (further citation omitted).

As the Court has previously observed, while Plaintiff argues that Defendant did not inform Plaintiff of pertinent facts or policy provisions relating to the coverage, Plaintiff does not identify "any language in the Policy that was functionally a misrepresentation to Mr. Salopek" nor does Plaintiff indicate any specific terms of which Mr. Salopek was unaware that relate to the denial of his claim. *See* MOO (Doc. 181) at 19. Although not plainly stated in Plaintiff's Bad Faith claim, some of Plaintiff's argument appears to suggest that Mr. Salopek did not understand the incontestability clause.[26] The New Mexico incontestability statute gives an insurer the right to rescind a policy based on material misrepresentations in an Application if the insurer does so within two years after issuing the policy. *See* N.M. Stat. Ann. § 59A-20-5 (1978);[27] *see also Crow*, 891 P.2d at 1212.

Plaintiff disagrees with Defendant's statement that the incontestability provision "states expressly that Defendant could contest the Policy during the first two years following the issue. Response to SJM (Doc. 203) ¶ 13. But Plaintiff admits that the Policy incontestability clause states: "We will not contest the Policy after it has been in force during the lifetime of the Insured

---

[26] If Plaintiff is arguing that Mr. Salopek did not understand the type of policy he purchased, this argument is not appropriate here as it is not alleged in the Complaint nor is there support for it in the record.

[27] The New Mexico Incontestability statute states:

    There shall be a provision that the policy (exclusive of provisions relating to disability benefits or to additional benefits in the event of death by accident or accidental means) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two (2) years from its date of issue.

NMSA 1978, § 59A-20-5.

for two years from the Issue Date, except for fraud (when permitted by the law of the state where the policy is delivered) and the nonpayment of premium." *Id*. Significantly, Plaintiff does not claim that the incontestability clause was ambiguous or that Mr. Salopek did not understand it.[28]

Information about the incontestability clause appears on the Policy. Unredacted SJM, Ex. 31 (235-29) at 33. Plaintiff Marcie Salopek signed a delivery receipt that she received the Policy the day before its effective date. Nothing in the law requires the insurer to do more.

Next, Plaintiff alleges that Defendant unfairly denied her claim. "[A]n insurer who fails to pay a first-party claim has acted in bad faith where its reasons for denying or delaying payment of the claim are frivolous or unfounded." *Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 236 9N.M. 2004) (citing *State Farm Gen. Ins. Co. v. Clifton*, 527 P2d 798, 800 (1974)) A denial is frivolous or unfounded when it arises from an "arbitrary or baseless refusal to pay, lacking any support in the wording of the insurance policy or the circumstances surrounding the claim…." *Sloan*, 85 P.3d at 237. "An insurer's frivolous or unfounded refusal to pay is the equivalent of a reckless disregard for the interests of the insured." *Id.* at 232. An insurance company may rebut an allegation of bad faith with evidence of the reasonableness of its conduct. *Cleveland*, 293 P.3d at 958.

Defendant asserts that it denied the Policy claim based on the Policy terms and its investigation. The Policy specified that if any statements in the Application were untrue or incomplete then Defendant "may have the right to void this Policy." Unredacted SJM, Ex. 31 (Doc. 235-29) at 32-33. Subsequently, when Defendant's investigation uncovered evidence that Mr. Salopek had used more alcohol and tobacco than represented in the Application, Defendant

---

[28] The Court observes that the wording of the incontestability clause in the Plaintiff's Policy closely tracks the wording of the statute. New Mexico courts do not strictly construe language against an insurer when the wording is prescribed by statute but interpret the language "so as to fulfill the statutory intent behind the required language." *Crow*, 891 P.2d at 1210.

voided the Policy. Plaintiff does not argue that the terms of the Policy did not permit rescission if there were misrepresentations on the Application.

Rather, Plaintiff argues that Defendant's denial of her claim was baseless. Her arguments focus on the scope of Defendant's review, arguing that it was unreasonable because "underwriting review took only a few hours," the claims reviewer did not consider the fact that Defendant had some pre-Policy facts showing that Defendant used alcohol and tobacco significantly more than listed in the Application, and that the claims reviewer "cherry picked" information so as to obscure the fact that Defendant had information that Mr. Salopek used alcohol and tobacco exactly as indicated on the Application. Response to SJM (Doc. 203) at 27-28. But Plaintiff's arguments undermine her conclusion.

Notably, Plaintiff vacillates on whether there was a misrepresentation, arguing both that Mr. Salopek did not misrepresent his alcohol and tobacco use on the Application on the one hand, and on the other hand that there was evidence within the Application that should have made Defendant aware there were misrepresentations. Plaintiff's argument both for and against the existence of evidence concerning Mr. Salopek's true use of tobacco and alcohol indicates that Defendant had a reasonable question about the information regarding Mr. Salopek's alcohol and tobacco use.

Moreover, there is evidence that supports Defendant's actions in denying the Policy claim. Mr. Salopek's representation that he had only 1-2 beers a day as well as his representation that he only used tobacco "now and then" but not since 2009 is contradicted by his medical records which indicate that he may have had as many as 16 beers a day and that he had continued to use tobacco through 2015. Unredacted SJM, Ex. 37 (Doc. 235-4) at 3 (email summarizing results of claims investigation and noting that hospital records indicate the ongoing use of

chewing tobacco and the heavy use of alcohol). It was reasonable for Defendant to consider

conflicting information in deciding to deny Plaintiff's claim. A reasonable but erroneous position

in the denial of a claim does not establish the elements of bad faith. *Jackson Nat. Life Ins. Co.*,

827 P.2d at 135.

Next, Plaintiff appears to argue that Defendant could not void the Policy and that it was

unreasonable for it to do so because it had imputed knowledge of any misrepresentations and so

had waived any rights it had under the Policy terms. Even if the actions of Defendant's agent

gave Defendant imputed knowledge of any misrepresentations, that imputed knowledge does not

eliminate or void the Policy conditions, it merely estops Defendant from asserting them. *See*

*Jackson Nat. Life Ins. Co.*, 827 P.2d at 134 (while the actions of an agent may make conditions

in a Policy unenforceable, they do not waive them). Because there is a reasonable question about

whether there was liability, as a matter of law, Defendant's denial of the claim was not frivolous

or unfounded. As Plaintiff's own argument indicates, Defendant was faced with a reasonable

question, so Plaintiff has not established any foundation for Plaintiff's allegation that

Defendant's denial of the Policy claim was "arbitrary and baseless." *See Sloan*, 85 P.3d at 233

("'an insurance company does not act in bad faith by denying a claim for reasons which are

reasonable under the terms of the policy'") (quoting UJI 13-1702); "[A] n insurer has a right to

refuse a claim without exposure to a bad faith claim if it has reasonable grounds to deny

coverage." *Cleveland,* 293 P.3d at 958 (citing *Jessen v. Nat'l Excess Ins. Co*., 776 P.2d 1244,

1246 (N.M. 1989) (further citation omitted).

Plaintiff's next argument is that Defendant had an obligation to follow its own claims

review Guidelines and a failure to do so was bad faith. Specifically, Plaintiff contends that under

the Guidelines terms, once a claims examiner had assessed all factors for a claims review, "a

roundtable presentation and discussion is scheduled." *See* Unredacted Response to SJM (Doc. 205-1) Ex. 11 at 48:7-25, 49:1-9. Defendant responds that its internal guidelines are guidelines only that do not obligate Defendant to follow specific review policies. Plaintiff offers no legal support to rebut Defendant's position. Similarly, Plaintiff offers no factual support that the failure to follow the internal guideline for a roundtable presentation and discussion could have impacted or changed a decision to deny a claim when there is a reasonable basis to do so.

3. *Plaintiff has not offered any evidence showing that Defendant investigated the Policy in bad faith*

Plaintiff's last three allegations focus on Defendant's conduct in the performance of the Policy contract. An insurer must act reasonably by conducting a fair investigation and a fair evaluation of a Policy claim. *Haygood v. United Servs. Auto. Ass'n*, 453 P.3d 1235, 1242 (N.M. Ct. App. 2019). First, Plaintiff alleges that Defendant regularly conducts investigations in bad faith, because Defendant has "a policy and practice of overly scrutinizing and denying life insurance claims when the insured dies within two years of obtaining coverage." Complaint (doc. 1-1) ¶ 75(e).

Plaintiff has produced no evidence that Defendant has a policy or practice of over scrutinizing and denying life insurance claims. This allegation first begins with an assumption, not with evidence, that Defendant regularly engages in an unreasonable course of conduct. Then, Plaintiff concludes that Defendant must have engaged in similar behavior in this case. But Plaintiff's premise and therefore, her conclusion, rely solely on evidence from a single case, this one. A single instance is not a course of conduct. Nor has Plaintiff identified any evidence that Defendant overly scrutinized her claim. More importantly, the law permits an insurer to investigate a claim when a claim is made within two years of the issuance of a policy.

Similarly, Plaintiff has offered no evidentiary or legal support for her last two Bad Faith

claims. Plaintiff argues that Defendant unreasonably did not attempt "in good faith to effectuate a prompt, fair and equitable settlement of Plaintiff's claim" or "promptly provide Plaintiff a legitimate reason or explanation on the basis relied on in the policy in relations to the facts or applicable law for denial of the claim." Complaint (Doc. 1-1) at 50. Neither assertion has support in the record or in the law.

In New Mexico, when "deciding whether to pay a claim, the insurance company must act reasonably under the circumstances to conduct a timely and fair [investigation] [evaluation] of the claim." UJI 13-1702 NMRA (brackets in original). "Reasonable grounds will generally follow from reasonable investigation." *Haygood*, 453 P.3d at 1241. An insurer will be liable for bad faith if the insurer has an unfounded belief because of a failure "to undertake an investigation adequate to determine whether its position is tenable." *Cleveland*, 293 P.3d at 958.

The law does not require an insurer to settle a claim if the insurer has a reasonable basis for denying it. Nor does New Mexico impose a duty on an insurer to conduct a perfect investigation. *See Cleveland*, 293 P.3d 958. As discussed previously, Defendant had a reasonable ground for denying Plaintiff's claim based on the terms of the Policy and evidence that Mr. Salopek had misrepresented his alcohol and tobacco use. While there is a contested issue about whether Defendant reasonably relied on those misrepresentations, that does not extinguish the reasonableness of its action in denying the claim. *See Jackson Nat. Life Ins. Co.*, 827 P.2d at 135.

Finally, Plaintiff asserts that Defendant unreasonably delayed in processing the claim by "[f]ailing to promptly provide Plaintiff a legitimate reason or explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of the claim." An investigation may be untimely and unfair when there is "an unreasonable delay in notification, timely evaluation and timely payment." *Haygood*, 753 P.3d at 1242-43 (quoting UJI 13-702 NMRA). Plaintiff has

not provided any evidence that Defendant unreasonably delayed in processing Plaintiff's claim or was untimely in its denial. Plaintiff filed a claim with Defendant on September 20, 2016. Defendant denied that claim and returned Plaintiff's premium payment on January 13, 2017. Nothing in the record or in the law suggests that four months is an unreasonable period in which to investigate this claim.

Plaintiff has not met her burden of showing that there is sufficient evidence to sustain her claims as to Count II, Bad Faith.

IT IS ORDERED THAT:

1. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PRINCIPAL-AGENT RELATIONSHIP BETWEEN DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY, BGA INSURANCE AND LUIS MIGUEL SISNIEGA (Doc. 191) is DENIED;

2. DEFENDANT ZURICH AMERICAN LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. 193) is DENIED as to Count I, Breach of Contract and is GRANTED as to Count II, Bad Faith.


_____
SENIOR UNITED STATES DISTRICT JUDGE